CRANE *vs.* MEGINNIS—*Court of Appeals, Eastern Shore, June term,* 1829.

The constitution of this State composed of the declaration of rights, and form of Government, is the immediate work of the people in their sovereign capacity, and contains standing evidences of their permanent will. It portions out supreme power, and assigns it to different departments, prescribing to each the authority it may exercise, and specifying that, from the exercise of which it must abstain.

The public functionaries move in a subordinate character, and must conform to the fundamental laws or prescripts of the creating power. When they transcend defined limits their acts are unauthorised, and being without warrant, are necessarily to be viewed as nullities.

The legislative department is nearest to the source of power, and is manifestly the predominant branch of the Government. Its authority is extensive and complex, and being less susceptible on that account of limitation, is more liable to be exceeded in practice.

Its acts out of the limit of authority assuming the garb of law, will be pronounced nullities by the Courts of Justice ; it being their province to decide upon the law arising in questions judicially before them, and upon the constitution as the paramount law.

The check to legislative encroachments is to be found in the declaration, that the legislative, executive and judicial powers, ought to be kept separate and distinct; and the solemn obligations of fidelity to the constitution under which all legislative functions are performed.

Divorces in this State from the earliest times have emanated from the General Assembly, and can now be viewed in no other light, than as regular exertions of legislative power.

The suit for alimony in this State is a distinct remedy from the proceedings to obtain a divorce, and for a series of years the wife's maintenance has been recoverable through the intervention of our judicial tribunals.

A divorced wife may recover, (having merits) a maintenance suitable to her station in life, and to quadrate with the situation of her husband, by a bill in Chancery.

The 3d section of the act of 1823, *ch.* 95, by which the legislature required a husband to pay a trustee for the use and benefit of his wife, from whom such act divorced him, a sum certain annually, is an exercise of judicial authority, repugnant to the constitution of *Maryland* and void.

APPEAL from *Kent* County Court. This was an action of *Assumpsit*, brought by the appellant as trustee of *Mary Meginnis*, to recover the sum of $150, being the first semi-annual instalment of an annuity directed by an act of the General Assembly of *Maryland*, to be paid the said appellant by the appellee, for the use of the said *Mary*.

The declaration stated, "that whereas heretofore, to wit, at a session of the General Assembly of *Maryland*, begun and held at the *city of Annapolis*, on the first Monday of the month of December, in the year 1823, by a certain act of the said General Assembly, entitled 'an act for the relief of *Mary Meginnis*, it was amongst other things enacted, that the said *Casparus Meginnis*, should from the passage of the said act, be and he was thereby altogether deprived, of all and every interest, authority, power and control in, over, and to the person of *Mary Meginnis*, his wife, as fully as if she had never been married; and that the said *Mary* should be, and she was thereby declared capable to have, hold, take, receive, sue for, and recover, by compromise, suit or suits, in law or equity, property of any kind whatever, real, personal, or mixed, in as full, and ample a manner, as if she was a *feme sole*, and to use and enjoy, or dispose of the same, at her will and pleasure, and might in her own name sue and be sued as if she was a *feme sole*; and the said *Casparus* should annually thereafter pay to the said *John Crane*, who was thereby made trustee in that behalf, to and for the use and benefit of the said *Mary*, the sum of $300, in two equal instalments, the first on the first day of March, and the second on the first day of September, in each and every year, during the joint lives of the said *Casparus*, and *Mary*, and the said trustee should be authorised to institute

suit in his own name for any instalment, which should not be paid on the day on which the same was thereby declared to be due, and it should be the duty of the court before whom the suit was brought to try the same at the term to which the writ was made returnable; and that the said *Casparus Meginnis*, should not be liable for any debts to be thereafter contracted by the said *Mary;* and that the annuity thereby directed to be paid should cease on the death of the said *Casparus* or *Mary*, whichever of them should first die ; and that nothing therein contained should in any manner prevent the said *Mary*, if she should survive the said *Casparus*, from claiming the part or share of his estate, real, personal or mixed, which she would be entitled to, if the said act had not passed : And that if the said *John* should die or refuse or neglect to act as trustee, it should, and might be lawful for the *Orphan's* Court of *Kent* County, on the application of the said *Mary*, to appoint a trustee for her benefit, who should thereafter be invested with all the authority thereby given to the said *John*, as by the record of the said act of Assembly remaining of record in the office of the Clerk of the Court of Appeals for the Western Shore, may more fully and at large appear ; and the said *John* in fact saith, that after making of the said act of Assembly, the said *John* took upon himself the execution of the said trusteeship, and that the said *Casparus* and *Mary* both continued in full life from and after the passage of the said act of Assembly, until the first day of March in the year 1824, and still are in full life, to wit: at *Kent* County aforesaid, by reason whereof, &c. To this declaration the defendant demurred generally, and the plaintiff joined in demurrer. A *pro forma* judgment was rendered by the County Court on the demurrer for the defendant, and the plaintiff, appealed to the Court of Appeals.

The cause was argued at June term, 1828, before EARLE, MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Chambers* for the appellant,

The objection urged against the act of 1823, *ch.* 95, in virtue of which the action was instituted, was understood to arise out of the 10th sect. of the 1st article of the Constitution of the

United States, which prohibits the passage by a State Legislature, of "any *ex post facto* law, or laws impairing the obligation of contracts."

The act of 1823, is certainly not an *ex post facto* law. Such a law has relation to *acts* of a party, not to rights of property: an enactment which makes that a crime which was not a crime, at the period of its commission. *Vid Celdon and wife vs. Bull and wife, 3 Dal.* 386. The exposition by Judge Chase and Judge Patterson as to this provision.

Nor does this act impair the obligation of any contract within the meaning of the constitution. Contracts relating to money and property were those only which it was intended to include in these expressions. Marriage contracts were never contemplated. It has not heretofore been questioned, and is not now, that the legislature can grant a divorce, even a divorce *a vinculo matrimonii*, which not only impairs but destroys the marriage contract. It is one of those matters of internal police, which the interests of society require should be fit matter for legislation, and which the States never could have designed to transfer to the general government or to surrender. It has been exercised at all times, and in most, if not all the States. If then the right to grant divorces be vested in the legislature, it is necessarily an incident to its useful exercise, that there should also be power to express the terms of the divorce, to arrange matters of property for the future subsistence and comfort of an injured wife. The same solemnity, and the same obligation could be urged for the protection of the marital rights, which could be urged for the protection of the rights of property. The reason is not perceived why one may be invaded by legislative interposition, and the other be exempt. Accordingly, we find such to be the uniform practice of the legislature, who have by the same act, assumed jurisdiction over the estates of individuals so far as to make proper provision for their future pecuniary comfort. Practice and acquiescence fix the construction, and courts will not afterwards allow it to be disturbed. 1 *Cranch,* 299, *Steuart vs. Laird.* A variety of laws from an early period of our history, will be found in the statute book, and indeed, for many years,

the law of 1818, *ch.* 203, enacted when some of the most distinguished legal characters in the State were members of the legislature, has been a sort of *formula.*

Should it be urged that this act assumes powers, as belonging to the legislative department of the government, which rightfully belongs to the judicial tribunals, and therefore opposed to the Maryland Bill of Rights, which declares they shall be kept separate and distinct, a great number of acts may be referred to, in which judicial power to the same extent has been exercised and sustained. In the case of *Garrettson vs. Cole,* 1 *Harr. & Johns.* 391, the court paid respect to a law empowering the Court of Appeals to reinstate a cause after its decision.

Should a difficulty be made, because of the summary process provided in this act, the court will find it obviated by the case of *Bank of Columbia vs. Okely,* 4 *Wheaton,* 235.

*Spencer* and *Bayly* for the appellee, referred to 2 *Burns Ecles. Law,* 434. 3 *Bla. Com.* 94. 1 *Fonb. Eq.* 90, note 104. *Duncan vs. Duncan,* 19 *Ves. Jr.* 397. *Galmith vs. Galmith,* 4 *Harr. & McH.* 477. *The Act of* 1777, *ch.* 12, sec. 4. *Watkyns vs. Watkyns,* 2 *Atk.* 97. 6 *Article Bill of Rights.* 18 *Article Bill of Rights.* *Whittington vs. Polk,* 1 *Harr. & Johns.* 236, 242. *Vanhorne's lessee vs. Dorrance,* 2 *Dall.* 304 to 307. 1 *Bay's Rep.* 252, 382. 21 *Article of the Constitution.* *Act of* 1676, *ch.* 21. 1678, *ch.* 18.

*Carmichael* on the same side, contended, that the right of a court of judicature to review a law, when the constitutional rights of a citizen had been thereby affected, had been solemnly established in *Maryland,* and being admitted by the counsel for the appellant, it became unnecessary to refer to authorities to sustain the principle. In the sound and judicious exercise of this power the people found security.

In questions of this nature it was necessary to refer to the country from which are derived the principles of our jurisprudence. Claims for alimony were there cognizable in the spiri-

tual courts, and under certain circumstances in the Court of Chancery of *England* obtained a hearing.

The rules and principles by which the decision of cases of this nature were there regulated, might be found by reference to 1*st Chitty's Black.* 441. 3 *Ib.* 94. *Watkyns vs. Watkyns*, 2 *Atk.* 97. 1 *Fonb. Eq.* 94, *note* 104. *Duncan vs. Duncan*, 19, *Ves. Jr.* 396, 397.

From the researches of counsel it did not appear in what court under the colonial government, the claims for alimony were considered. That such causes were not heard and adjudicated, by the Commissary General or his deputies, might be inferred from the silence of *Valletto* in his Deputy Commissary's Guide.

Whether they were in the Court of Chancery was a question to which no evidence could be readily furnished. The only case that had been decided in the *Province* is to be found in *Galmith vs. Galmith*, 4 *Harr. & M^cH.* 477, in that case the County Court of *Calvert* had heard and given judgment upon a claim for alimony, which judgment was reversed by the Provincial Court.

By the declaration of Independence in 1776, *Maryland* became a sovereign, independent state with general powers; the limitations to the exercise of which existed only in the constitution and bill of rights. At this period it could not be denied, that the claim for alimony was within the jurisdiction of the legislature.

There was no other tribunal, before which it could be presented. No such authority had then been imparted to the judicial tribunals, or to the executive of the State. But in the next year, the cognizance of claims for alimony was given to the Court of Chancery. This will be found in the 14 *sec.* of the 12 *ch.* of the *Act of* 1777.

The right of the wife to alimony did not arise necessarily on separation from the husband. If under the influence of a perverse and evil temper she absconds, or if she elope with an adulterer, she can sustain no claim for alimony. But wherever it is claimed, enquiries as to conduct of this nature, may be in-

stituted; and in 1777 the legislature feeling that such investigations, comported not with the nature of the functions they were intended to discharge, and that justice to the parties could not be rendered, invested the Chancellor with authority to hear and decide all questions of this nature. *Meginnis* as a free citizen of *Maryland* could not be deprived of his property, but by the judgment of his peers, or the law of the land. This was a security extended by the bill of rights to him, in common with the other citizens of the State. Before a claim of alimony could be established against him, he was entitled to a hearing of all the circumstances of the case, in the Court of Chancery. This was secured to him by the act of 1777, *ch.* 12, *sec.* 14. This was the law of the land, and any act of the legislature depriving him of this right was a direct violation of those first principles upon which the government is based. It operated by robbing him of the protection of the law of the land; such is the *act* of 1823, *ch.* 93. By this act the legislature clothed themselves with powers vested in the Chancellor by the act of 1777, and undertook to dispose of private rights which could be affected by them, only by a violation of the constitutional rights of a citizen.

Among other evils that were felt under the colonial government, were those which arose from the exercise by the *English* colonial governors of all the functions of government, executive, legislative and judicial. The bill of rights regarding the abuses necessarily incident to the concentration of these powers, declared that the legislative, judicial and executive powers, shall be kept for ever separate and distinct. In pursuance of this principle the act of 1777 was passed. Whether a modern legislature have the constitutional right to repeal this law, and clothe themselves with power to hear and adjudicate cases of alimony is not the matter to be decided; but it is whether this law being unrepealed, and in force, the legislature of 1823 had the right, to subtract this particular cause from the legal tribunals of the State, make the courts of a law a registry for their decisions, and impose upon them, the task of giving efficacy to a law, without the power of enquiring into its justice or legality.

*Chambers* in reply.    The sixth article in the bill of rights, like the other declaratory articles in the same instrument, was intended to assert a general principle.    No government ever did, or ever can exist, in which a precise verbal and literal execution of that article and others will be found.    Those who framed, and those who enforced our admirable principles of government, so considered them.    The 47th number of the *Federalist,* from the pen of *Mr. Madison,* shews this fully.

It would be an endless task to cite to the court, the numberless instances in which the principle, if taken in the latitude now claimed has been impugned.    In the very first session after the bill of rights was framed, and when no doubt the very men who adopted it were members of the legislature, we find laws to *revive proceedings in court,—to revive and aid proceedings in court,— to direct the recording of a deed.    In the next year,* 1778, *laws were made to empower persons to sell land,—to authorize a deed to be recorded,—to enable a widow and executrix to sell her testator's land.    In* 1779, *to revive and aid proceedings in Talbot Court,— to revive and continue actions and process in Worcester Court,— same in Caroline Court,—to enlarge the powers of an executrix, and to record deeds, and to take depositions.*    These are acts partaking of a judicial character, some in a greater degree, others less, but all more than the case at bar.    In most of these cases, there was a plain and ample existing remedy through the judicial tribunals ; here there was no power but the legislature who could administer remedy for the principal evil, and in this exercise of exclusive power over the principal subject, they have legislated also for the accessory.    The same system of legislating, has been continued from our primeval history to this period, and the labor or the learning of the adverse counsel have not produced the evidences of the want of constitutional obligation in these laws.    This case of *Steuart vs. Laird,* would seem to make them a contrary evidence of themselves, being a cotemporaneous construction.    The sole object of these declaratory principles, is to prevent the usurpation by one branch of the government, of such power and jurisdiction belonging to another branch, as would consolidate the one and annihilate the other,

at least to an extent which would encourage the use of arbitrary power.

If this was a case of alimony, distinctly and exclusively, there would be reason for the objection urged. It is conceded, that the subject of alimony, is one of *judicial* cognizance, according to the laws of *Maryland.* But alimony is not recoverable in a case of separation without divorce.

The twenty-first article of the bill of rights is subject to the same limitation, as before applied to the sixth. Such a case as the present, is not in its contemplation. Private property is taken for public service in seasons of war, for roads, canals, and other great exigencies, and taken against the will of its owner, and without any supposed violation of this article in the bill of rights. So private property, and private rights, must yield to the more imperative claims of public interest, and the proper police of the State. The marital rights acquired by the contract, are as solemnly secured, and as distinctly defined, and as important in their character, as the rights of real or personal property, and yet these are affected and destroyed, when their longer possession by the individual, conflicts with the great principles which regard the morals and well-being of society : and when affected, they require of necessity the incidental operation of the law upon the pecuniary rights of the parties. But in this case it is contended, the law of the land and the judgment of peers, are the instruments by which the party's property is to be taken away. The act of Assembly is the law of the land, and the trial by a jury is secured to him.

There is no evidence in this case, that the act passed without the consent of the husband, and to reject any presumption necessary to sustain the act of the legislature, would be in disobedience to the courtesy and respect, which are due from one branch of the government to the other, according to the principles of both political and municipal law.

If this power does not reside in the legislature, it exists nowhere. The laws of *Maryland* have not conferred on any judicial tribunal, the power to divorce or separate husband and wife. The legislature alone, is competent to exercise jurisdiction on

the subject, and being in possession of jurisdiction of the principal matter, can rightfully do whatever the peculiar circumstances of a case may demand, and it is a most delicate office in an inferior or co-ordinate department of the government, to assume, that it has acted unadvisedly and without competent information of the facts, or to pronounce its enactment, in violation of the constitution or bill of rights.

EARLE, J. at this term delivered the opinion of the Court.

A constitutional question is involved in the consideration of this case, and before we enter upon the solution of it, we will state some positions preliminary to the subject.

The constitution of this State, composed of the declaration of rights and form of government, is the immediate work of the people, in their sovereign capacity, and contains standing evidences of their permanent will. It portions out supreme power, and assigns it to different departments, prescribing to each the authority it may exercise, and specifying that from the exercise of which it must abstain. The public functionaries move then in a subordinate character, and must conform to the fundamental laws or prescripts of the creating power. When they transcend defined limits, their acts are unauthorised, and being without warrant, are necessarily to be viewed as nullities. If considered as valid acts, the distinction between unlimited and circumscribed authority is done away, the derivative exerts original power, and of constitutional law nothing is left but the name.

The legislative department is nearest to the source of power, and is manifestly the predominant branch of the government. Its authority is extensive and complex, and being less susceptible on that account of limitation, is more liable to be exceeded in practice. Its acts, out of the limit of authority, assuming the garb of law, will be pronounced nullities by the courts of justice; it being their province to decide upon the law arising in questions judicially before them, and upon the constitution as the paramount law; but this is more in fulfilment of their own duty, than to restrain the excesses of a co-ordinate department of the government. The check to legislative encroachments is to be

found in the declaration, that the legislative, executive, and judicial powers ought to be kept separate and distinct; and in the solemn obligations of fidelity to the constitution, under which all legislative functions are performed.

With these general views of constitutional law, we proceed to consider the questions more immediately before the court. On the argument of the cause, the courts attention was directed to act of Assembly passed in 1823, entitled, "An act for the relief of *Mary Meginnis*," which the appellee's counsel asserted to be in violation, in some of its provisions, of the constitution of the State. Should it be found to be so, the judgment of *Kent* County Court will be affirmed, the appeal having been taken in a suit founded wholly upon this act of Assembly. Whether the act is then an infringement of the constitution, is the main question to be determined by this court, and it rests upon the two following points: Is the enactment of the third section of the act of 1823, an exercise by the legislature of judicial power ? Is the exercise by the legislature of judicial power, in the passage of a law, repugnant to the constitution?

The act of 1823 is an act of divorce, separating *Mary Meginnis* from the bed and board of her husband, and its third section is clothed in this language: "And be it enacted, that the said *Casparus Meginnis* shall annually hereafter pay to *John Crane* of *Queen Ann's* County, who is hereby made the trustee in that behalf, to and for the use and benefit of the said *Mary Meginnis*, the sum of three hundred dollars, in two equal instalments, the first on the first day of March, and the second on the first day of September, in each and every year during the joint lives of the said *Casparus Meginnis* and *Mary Meginnis*, and the said trustee shall be authorised to institute suit in his own name for any instalment which shall not be paid, on the day on which the same is hereby declared to be due, and it shall be the duty of the court before whom the suit is brought to try the same at the term to which the writ is made returnable." This grant of an annuity, is called a grant of alimony, and it is contended, that after the legislative separation, it might have been recovered by the wife in the Court of Chancery, pursuant to

the laws of this State, if her case merited the interference of
the Chancellor, and the circumstances of the husband justified
the allowance of such a sum.

The investigation of this point led us into a general review
of the *British* law of divorce and alimony.   From the research
it has appeared to us, that they are both of judicial cognizance
in the Ecclesiastical Courts of that country ; that the divorce *a
mensa et thoro* separates the parties for unfitness for the mar-
riage state, and the separation is the remedy administered for
the injury to the suffering party; that alimony is the maintenance
afforded to the separated wife for the injury done her by her
husband, in neglecting or refusing to make her an allowance
suitable to their station in life, and is treated as a consequence
drawn from the divorce *a mensa et thoro;* and that each of those
matrimonial causes is dependent on different facts, and is re-
dressed by different judgments, although both are within the
jurisdiction of the same tribunal.   In this State the act of di-
vorcing man and wife has been performed by the legislature,
for the want perhaps of ecclesiastical authority to effect it, or
borrowing perchance the power from the parliament of *Great
Britain,* which sometimes granted divorces *a vinculo matrimo-
nii,* for supervenient causes, arising *ex post facto,* a thing that
the spiritual courts could not do.   However this may be, divor-
ces in this State from the earliest times have emanated from the
General Assembly, and can *now be viewed in no other light,*
than as regular exertions of legislative power.   The private
acts passed for more that ten years back we have adverted to,
and almost every divorce law has been found to be expressed
in terms peculiar to itself.   In some, the mere separation from
bed and board is effected in the plainest and shortest way, as
in the case of *Francis B. Mitchell* by the act of 1822, *ch.* 138,
and in the case of *Sarah Kerr* by the act of 1824, *ch.* 118; and
in other acts, separating the married parties, particular conse-
quences of a continuing coverture are sedulously guarded
against.   In none, not even in the act of 1818, *ch.* 203, referred
to by counsel, is there any thing like a provision for the future
maintenance of the wife, graduated to the circumstances of the

husband, and the station in life of the parties, as the act of 1823 would appear to be. On the other hand, the suit for alimony in this State, as in *Great Britain*, is a distinct remedy from the proceedings to obtain a divorce, and for a series of years the wifes' maintenance has been recoverable through the intervention of our judicial tribunals. So early as the year 1689, in the case of *Galwith vs. Galwith*, 4 *Harr. & M'Hen.* 477, it was asserted in the Supreme Court of the Province, that alimony is only recoverable in Chancery, or the Court of the Ordinary; and in the year 1777, the act of Assembly was passed, which expressly authorised the Chancellor to hear and determine all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of *England* in the Ecclesiastical Courts there. Since this last period, such causes have been continually acted upon by the Chancellor, and in some instances appeals have been taken to the Appellate Courts, and decided on by them. And we cannot permit ourselves for a moment to doubt, that if *Mary Meginnis*, like *Francis B. Mitchell* and *Sarah Kerr*, had obtained simply an act of divorce, she might have recovered, having merits, a maintenance suitable to her station in life, and to quadrate with the situation of her husband, by a bill in Chancery, or an application to the equity side of *Kent* County Court. If she could have been thus redressed by an exercise of judicial authority, we would ask, is it not fair to conclude that the redress granted to her by the legislature, is an exercise of judicial authority? The nature of the power employed must be judged of, by having an eye to the like power exercised by a co-ordinate department. Should the executive try and sentence a felon to punishment, the judicial authority exercised could not be mistaken: and should the judiciary undertake to enact and promulgate a law, and exact obedience to it, the act would doubtlessly be pronounced, at once, an usurpation upon the functions of the legislature.

The enactment of the third section of the act of 1823, being in our opinion an exercise by the legislature of judicial power, our attention will now be engaged for a short time with the en-

quiry, whether the exercise by the legislature of judicial power in the passage of a law, is repugnant to the constitution.

The decision of this point must depend upon the sound construction of the *sixth section* of the bill of rights, which says, "that the legislative, executive, and judicial powers of government, ought to be forever separate and distinct from each other." This political maxim made its appearance, in some form, in all the state constitutions formed about the time of the war of the revolution, and is said to have been borrowed by them of the celebrated *Montesquieu's Spirit of Laws*, vol. I. p. 181. In whatever terms they have adopted it, in none of these constitutions are the several departments kept *wholly* separate and unmixed. In some of them, as in the constitution of this State, the executive is appointed by the legislature, and the judiciary by the executive, and in others, the powers of the several departments are still more blended and mingled together. Upon a full consideration of each of them, it seems to us to have been the intention to ingraft this invaluable maxim of political science on their respective systems, only as far as comported with free government, and to prohibit the exercise by one department of the powers of another department, or to confine each department to the exclusive exercise of its own powers. This last is admirably expressed in the constitution of *Massachusetts*, and evinces a perfect acquaintance of its framers with the pages and doctrines of Baron *Montesquieu*. It is worded thus: "That the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them." The inhibition goes to the *practical* exercise of powers conferred by the constitution, and to be used after it is in operation, and does not apply singly to the original distribution of powers among the departments of the government. In the same sense we construe the *sixth* article of our bill of rights, which has the same objects in view with the constitution of *Massachusetts*, although somewhat different terms are employed to express them. The one imitates the language, and the other dives into and ex

presses the meaning of the venerated author from which they both copied. Their common purpose is to confine in practice, the action of each department to its own appropriate sphere, by forbidding to it the use of powers allotted to the co-ordinate departments.

We have already determined the first point, and we have now to add our perfect conviction, that the exercise by the legislature of judicial power in the passage of a law, is repugnant to the constitution. Our conclusion from all this reasoning is, that the *third section* of the act of 1823 is a nullity, and was rightly considered unavailable to support the plaintiffs action in the County Court where the suit originated, and that the judgment therefore ought to be affirmed.

In acting upon this case, we wish to be understood to decide nothing but the points before mentioned—only to adjudge that the exercise by the legislature of judicial power, is in opposition to the constitution, and that the enactment of the *third* section of the act of 1823, was an exertion of judicial power, and is necessarily a void act.

JUDGMENT AFFIRMED.