## THE COUNTY COMMISSIONERS OF QUEEN ANNE'S COUNTY *vs.* COUNTY COMMISSIONERS OF TAL- BOT COUNTY.

*Constitutional Law—Exercises of Judicial Power by the Legislature— Act Requiring One County to Pay to Another a Certain Sum for the Construction and Maintenance of a Bridge.*

An Act of Legislature determining what amount is due by one county to another, and directing the debtor county to pay such amount, is the exercise of a judicial power by the Legislature and is therefore uncon- stitutional and void.

The Act of 1906, chap. 450, directed the County Commissioners of Talbot County to pay to the County Commissioners of Queen Anne's County, a designated sum of money, declared to be one-half of the cost of the construction of a bridge by the latter county, which was a benefit also to the former, and a certain sum annually for the purpose of maintaining the bridge.   *Held,* that since the Act does not leave the ascertainment of the actual cost of the bridge either to arbitration or judicial inquiry, and since it also fixes the amount to be paid for the maintenance of the bridge without regard to what the actual cost of said maintenance may be, it is void, because the exercise by the Legislature of judicial power, in violation of Declaration of Rights, article 8, which declares that the Legislative, Executive and Judicial powers of government ought to be forever separate and distinct from each other.

*Decided May 15th, 1908.*

Appeal from the Circuit Court for Talbot County (PEARCE, C. J. and ADKINS, J.)

The cause was argued before BOYD, C. J., SCHMUCKER, BURKE and WORTHINGTON, JJ.

*Edwin H. Brown, Jr.*, for the appellants.

*J. Harry Covington* and *Wm. Mason Shehan*, for the appellees.

WORTHINGTON, J., delivered the opinion of the Court.

The questions presented for the Court's determination in this case, arise out of a controversy between Queen Anne's and Talbot Counties as to whether the latter shall contribute to the cost of the construction and maintenance of a bridge over Kent Narrows, the *situs* of the bridge being wholly within the limits of the former county.

This is the third time questions concerning the same controversy have come before this Court for its consideration, and in order that the precise nature of the questions now to be considered may be clearly understood something of the history of the legislation in respect to this bridge and of the former adjudications of this Court in regard thereto, seems to be necessary.

A glance at a map of Maryland will show that Talbot

190 QUEEN ANNE'S CO. *vs.* TALBOT CO.

County lies south of Queen Anne's and adjacent thereto, from which it is separated, in part, by Wye river, both counties bordering upon the eastern shore of the Chesapeake bay.

Kent Island, which forms a part of Queen Anne's County, is an irregularly shaped strip of land lying in the Chesapeake bay in front of, and at varying distances from, the shore line of these two counties. From north to south the island measures perhaps some fifteen miles. The waters lying between the southern half of this island and the mainland, are known as Eastern bay.

The island, where it approaches nearest to the mainland of Queen Anne's county, was formerly separated therefrom by a narrow and shallow body of water known as Kent Narrows. So shallow was it that it could be waded across in many places without difficulty. In pursuance of the Acts of 1819, chapter 70, and of 1820, chapter 128, Queen Anne's county constructed across this shallow strait, a solid causeway, consisting of a crib of logs filled in with stone, earth and shells, and held together by piles driven along its sides from shore to shore. For about fifty years this causeway remained, serving all the purposes for which it was constructed, affording a safe and convenient means of travel between the island and the mainland, and costing but little to keep in repair.

As the southern half of Kent Island lay directly in front of the northern and northwestern portions of Talbot County, bordering upon Eastern bay and Wye river, and as the narrow passage between the Island and the mainland of Queen Anne's County, above-mentioned, was not navigable, the route of communication by water, between places located on this bay and river, and Baltimore City (and other places on the upper Chesapeake) was of necessity around the southern end of this Island, thus making the distance by this circuitous route much longer than it would have been by a route through the Narrows.

The idea was therefore conceived of cleaning out the Narrows and making it a navigable waterway. As this contemplated route of communication was intended principally for

the benefit of the people of Talbot County, her public men actively interested themselves to procure the necessary legislation to accomplish the purpose, and Congress was induced to make an appropriation for dredging out the Narrows and rendering the same navigable.

In order to make this appropriation available the consent of the Legislature of Maryland was required to the proposed plan.

Accordingly the Legislature of this State, at the special instance and request of Talbot County, by ch. 276 of the Acts of 1874, repealed all previous Acts relating to the Narrows, and the Government of the United States was given authority "to open and clean out the Narrrows, and to remove all obstructions therefrom." This included authority to remove or cut through the causeway, above mentioned, connecting the Island with the mainland.

Queen Anne's County resisted the passage of this Act, but without success, and by the same Act the two counties were required to build a substantial drawbridge across the Narrows to take the place of the causeway which the United States Government was authorized to remove.

The cost of building the bridge was by the Act put equally upon Queen Anne's and Talbot Counties. In pursuance of this legislation, the two counties entered ino a contract for the construction of a drawbridge across the Narrows, and levied money to pay the contractor for his work; and the general government caused the channel to be cleaned out and deepened.

The contractor for the bridge began its construction, but failed to complete the work, leaving it in such an insecure condition that it was greatly broken by the strong current which developed through the new-made channel. It was then discovered that the Act of 1874 made no provision for keeping the bridge in repair and safe for public travel, or for paying a keeper of the draw in the bridge, and subsequently the Act of 1876, ch. 314, was passed by which, after certain recitals in its preamble, it was enacted that the County

Commissioners of the two counties should levy a tax upon the assessable property of their respective counties, "for the purpose of erecting and keeping in repair a drawbridge over Kent Narrows, and providing for a keeper for the draw of said bridge," each county to provide and pay one-half the expense. It also ratified all acts done and all contracts made by the two counties in pursuance of the Act of 1874. The second section provided that the bridge should be a free bridge controlled by the two counties. Under the latter Act the Commissioners of Queen Anne's County proceeded with the work, but the Commissioners of Talbot County refused all further co-operation in the matter.

The reason of the refusal seems to have been that after cutting through the causeway and dredging out a channel in the Narrows deep enough to render the same navigable, a current developed through this new made channel so strong as to render the passage for steamboats unsafe, and therefore what was designed as a shorter route of communication by water for the people living in the north and northwestern portions of Talbot County, bordering upon Eastern bay and Wye river, with Baltimore City and other places on the upper portion of the Chesapeake bay, proved to be, as a waterway, practically of no use whatever.

Talbot County having refused to make any levy of taxes for the purpose of aiding in rebuilding and keeping in repair the bridge first made necessary by its active agency in securing the necessary legislation, application was made by the Commissioners of Queen Anne's County for a *mandamus* against the Commissioners of Talbot County to compel them to comply with the provisions of the Act of 1876, ch. 314.

That case came before this Court at the October term, 1878. The Commissioners of Talbot County contended that the Legislature had no power to compel it against its will, to levy taxes, incur debts, or assume obligations for purposes and objects wholly outside of its territorial limits.

This Court, however, held that the Act of Assembly was valid and that Talbot County should bear its proportion of

the expense of building and repairing the bridge in accordance with its provisions. *Talbot County* v. *Queen Anne's County*, 50 Md. 245.

JUDGE ALVEY, speaking for the Court in that case said: "It would be most unjust to require the whole expense of the work, and of keeping it in repair, to be borne by Queen Anne's County; and the fact that the bridge has its *situs* in the latter county, is no answer to the present application. While it would not be competent for the county to levy taxes to be expended in the construction of a road or bridge beyond its territorial limits, without the express authority of law, the bridge in question was not only authorized, but its construction and the levy of taxes to pay for it, were expressly directed by mandatory Act of the Legislature; and though the bridge is over a stream beyond the limits of the county, the authorities are quite explicit in maintaining, upon the ground of special and peculiar interest, that such mandatory legislation is constitutional and enforceable." See also, *Thomas* v. *Leland*, 24 Wend. 65, and *Carter* v. *Cambridge*, 104 Mass. 236.

In consequence of this decision Talbot County united with Queen Anne's in the repair and completion of the bridge, and for a period of years thereafter raised money by taxation to keep the bridge and the approaches thereto in repair, and to pay the keeper. But about the year 1887, by reason of the action of the weather and of the swift current through the channel over which the bridge was erected, it became unstable and unsafe for travel, and a new bridge was built by Queen Anne's county over the Narrows a short distance north of the former location.

The Commissioners of Talbot County refused to contribute to the cost of building the new bridge, the whole cost thereof being paid by the Commissioners of Queen Anne's, and thereafter Talbot County also refused to raise by levy or to furnish any money to keep the bridge in repair, or to pay the keeper of the draw, and in order to escape fully all liability on account of this bridge in 1902 Talbot County procured the passage of an Act of Assembly, being chapter 300, of the Acts of its

January session in that year, whereby the County Commissioners of that county were prohibited from levying taxes "for the purpose of constructing, repairing or maintaining any highway, public road or bridge which is not in whole or in part on land within the limits of said Talbot County," and the Act of 1876, chapter 314, was in terms repealed.

This Act was approved April 8th, 1902. Notwithstanding the passage of this Act, on July 23rd, in the same year, the County Commissioners of Queen Anne's County applied again for a *mandamus* to compel Talbot County to levy a sum of money to be used and expended in repairs to the original bridge, the approaches, abutments, part of the causeway and centre pier of which, it was alleged, still remained. Talbot County demurred to the petition, and the same was dismissed by the lower Court. The matter came before this Court for the second time at the January Term, 1906, and it was held that as the Act of 1902 repealed the Act of 1876 and forbade Talbot County from expending any money for building, repairing or maintaining any bridge outside its own territorial limits, the application should be denied. *Queen Anne's Co.* v. *Talbot Co.*, 99 Md. 13.

JUDGE PAGE, speaking for the Court, stated also as another ground upon which the prayer for relief should be denied, that apart from the Act of 1902, the Act of 1876 contemplated the construction of but one bridge across Kent Narrows, and as that one had been constructed, though practically destroyed by action of the weather, and of the current of water, no authority remained, under that Act, by which Talbot County could levy taxes for the purpose of repairing the old bridge, as the piers and abutments were practically all that remained of the original structure, and to *repair* it meant, in fact, to *rebuild* it, which Talbot County had no authority to do. This case was decided February 25th, 1904.

A bill was thereupon prepared and introduced in the Senate at the then current session of the Legislature to compel Talbot County to levy taxes to pay for one-half the cost of building a new or third drawbridge across the Narrows.

。QUEEN ANNE'S CO. *vs.* TALBOT CO.　　* 195

Md]　　　　　　　　Opinion of the Court.

It appears from the Journal of the Senate of that session (1904), that this bill, slightly amended, passed the Senate by a unanimous vote, and from the House Journal, that though it received in the House 47 votes in its favor and only 28 were cast against it, yet it failed for want of a constitutional majority.

As the public convenience required that a new bridge be constructed over the Narrows in order to render public travel between the island and the mainland practicable and safe, Queen Anne's County at the same session of the Legislature, obtained the passage of an Act authorizing her to issue bonds to the extent of $20,000 for the purpose of building such a bridge as was needed at that place. Under the authority of that Act (1904, ch. 315), Queen Anne's County issued bonds and built a new bridge which so far as appears still exists. This being the third bridge constructed across the Narrows since the cutting through of the causeway in 1874.

In 1906 an Act was passed, being chapter 450, of the Acts of 1906, authorizing, directing and requiring the County Commissioners of Talbot County "to levy on the assessable property of Talbot County and pay over to the County Commissioners of Queen Anne's County one-half of the sum of $19,333.55 and interest at the rate of five per cent per annum from September 1st, 1904, said levy to be made at the next annual levy of said county, and the annual levies thereafter in such way and in such sums as may be necessary to pay said sum of $9,666.77 to the County Commissioners of Queen Anne's County in eighteen annual instalments of $537.04⅓ each on the first day of January in each year and every year together with interest on said amount of $9,666.77, or whatever part remained unpaid at the time the instalment accrues, at the rate of five per cent per annum." The second section of the Act required Talbot County likewise to levy $2co per year for the purpose of maintaining the bridge and paying the keeper of the draw thereof.

The preamble to this Act recites the facts concerning the Narrows and causeway, substantially as hereinbefore set out,

and further that the cost of erecting the present bridge over the Narrows, had been the sum of $19,333.55, which had been raised by Queen Anne's County of necessity on bonds dated September, 1st, 1904, bearing five per cent interest, and that it was just, right and equitable that said Talbot County should pay at least one-half the said sum, and interest; and also the sum of $200 annually for the expense of maintaining the bridge and paying the keeper.

For the purpose of enforcing this Act of 1906, ch. 450, an action of *assumpsit* was brought by the County Commissioners of Queen Anne's County against the County Commissioners of Talbot County on February 21st, 1908. The declaration contains the common counts and also a special count on the statute, setting forth its more essential parts, in substance, as stated above.

A demurrer was filed to this declaration which was sustained and judgment entered for the defendant. From that judgment Queen Anne's County has appealed, and for the third time the controversy is before this Court for its consideration.

The substantial question in the case is whether the Legislature has, by the Act of 1906, chapter 450, attempted to exercise functions that belong to the judicial department of government, or in other words, has it attempted to pronounce a judgment or decree?

As to this question we are to observe that the amount which Talbot County is required to pay to Queen Anne's County, is by the Act itself ascertained, fixed and determined. The statute provides that there shall be paid to the latter county by the former the sum of $9,666.77 in eighteen annual instalments of $537.04⅓ each, with interest, and also the annual sum of $200 for the purpose of maintaining the bridge and paying the keeper of the draw.

This is done without any judicial inquiry as to how much the bridge actually cost or as to whether it be such a bridge as the public convenience of that locality reasonably requires or as to what the actual cost of maintaining the bridge may

be.   In some jurisdictions it is possible that such an ascertain-
ment by the Legislative branch of the government would
stand (8 *Cyc.* 807), but certainly it cannot in Maryland.

Article 8 of the Declaration of Rights declares "that the
Legislative, Executive and Judicial powers of government
ought to be forever separate and distinct from each other."

An Act of the Legislature determining what amount of in-
debtedness is due by one person to another, or by one county
to another, is an attempt to exercise judicial functions and
therefore unconstitutional and void.     8 *Cyc.*, 830.

In *State* v. *Hampton,* 13 Nev. 439, an Act providing for
paying the indebtedness of a city was held, so far as under-
taking to fix definitely the amount due to persons named
therein, to be void.   In an Ohio case the Act of Assembly
authorized the Commissioners of certain counties of that State
to levy a tax to pay certain fees to certain persons therein
named, but it did not determine the amounts to be paid to
each of them, nor the value of the services.   It referred the
matter of ascertaining these facts to a Judge of one of the
Courts.   In rendering its decision the Supreme Court said:
"In this we see no exercise of judicial power by the Legisla-
ture."   *Holtz* v. *Com. of Henry Co.,* 41 Ohio. St. 435.   But
the decisions of this Court are conclusive of the question in
this State.

The Act of 1823, ch. 95, sec. 3, directed that a husband,
who was by the same act divorced from his wife, should pay
annually toward her support the sum of $300.   This Court
held this section of the Act to be void, because it was an as-
sumption by the Legislature of judicial power.   *Crane* v. *Ma-
ginnis,* 1 G. & J. 463.

In *Porter* v. *Mayor,* 18 Md. 284, it was held that the pay-
ment of certain taxes could not be enforced because not prop-
erly levied.   A subsequent Act of Assembly provided that
the same persons should if they refused to pay one-half the
original assessment by a given time, be liable for the whole of it.

In *Mayor* v. *Horn,* 26 Md. 194, this Court struck down the
statute as an attempt by the Legislature to exercise judicia

**198    QUEEN ANNE'S CO. vs. TALBOT CO.**

Opinion of the Court.                    [108

functions.    We quote with approval the language of this Court in *State* v. *B. & O.*, 12 G. & J. 399, as follows. "To declare an Act of a co-ordinate department of the government an un-warranted assumption or usurpation of power, because it is a violation of a constitutional prohibition, is an exercise of the judi-cial office of a grave and delicate nature, which never can be warranted but in a clear case."

The fact that in this case the preamble recites that the bridge cost a specified sum, is no legal ascertainment of what the cost actually was; it may be the true amount, and likely is, but Talbot County has the right to be heard before judgment is pronounced against her.    We feel therefore constrained to say that in enacting chapter 450 of the Acts of 1906, the Legisla-ture transcended its powers, and that the statute is unconsti-tutional and void.

Before concluding this opinion, it may be well, in order to prevent misapprehension, to distinguish this case from that of *Worcester County* v. *Melvin*, 89 Md. 37.

In this last-mentioned case the County Commissioners re-fused to pay a claim for legal services rendered by the appel-lee, who had been appointed by the Circuit Court for that county to defend a prisoner indicted for the crime of murder. The appellee's account against the County Commissioners for the sum of fifty dollars was certified to, and approved by one of the Judges of the Circuit Court and filed with the Com-missioners.

The Commissioners having refused to pay the sum claimed, the appellee, Melvin, filed a petition praying for a writ of *man-damus* to compel them to make a levy therefor.

This Court held that, "The Legislature may require them, as public governmental agents to do acts involving the expen-diture of public money, and may impose on them the duty to make the expenditures without entrusting them with the slightest discretion as to the propriety of the measures or the amount of the cost." A number of instances are then cited where this authority had been exercised. But in all these cases the public funds were directed to be applied to well es-

tablished public uses, as for instance, to the support of the public schools of the county, or for the payment of officers' fees, or for some work to be done under the supervision and control of the County Commissioners, where the amount of the expenditure would be regulated by contract, or, as in the case then under consideration, where the claimant had performed legal services under the Court's control, and his account was approved by the Court.

In the case of *Pumphrey* v. *Balto. City*, 47 Md. 145, where the Act of 1876, ch. 220, is held to be a valid exercise of legislative authority, the Act provided for the purchase of the Harman bridge over Gwynn's Falls, but a board of arbitrators was provided for in the Act to ascertain the value of the bridge.

In the case of *O'Brien* v. *Balto. County*, 51 Md. 15, where the Act of 1876, ch. 101, is likewise upheld the Court says: "The amounts to be paid under or on account of these contracts, are not fixed or determined by the Act, but are left to be ascertained by the contracting parties, or if disputed to be determined by judicial decision."

While we should be glad to terminate this prolonged controversy by a final decision in this case, yet as the Act of Assembly now under consideration fixes the amount which Talbot County is to pay to Queen Anne's County for the construction of a bridge already completed, and situated wholly within the latter county, and does not leave the ascertainment of the actual cost of the bridge either to arbitration or judicial inquiry, and as it also fixes and determines the amount to be paid for the maintenance of the bridge without regard to what the actual cost of such maintenance may be, the Act discloses a palpable assumption by the Legislature of judicial power, and it becomes our plain duty to so declare.    The judgment will therefore be affirmed.

*Judgment affirmed with costs to the appellee.*