926 A.2d 216

**Joseph M. GETTY and James Harris**

v.

**CARROLL COUNTY BOARD OF ELECTIONS and Dana Lee Dembrow.**

**No. 139, Sept. Term, 2005.**

Court of Appeals of Maryland.

Per Curiam Order June 2, 2006.

June 21, 2007.

Joseph M. Getty (Law Office of Joseph M. Getty, Manchester, MD), on brief; Donald B.W. Messenger (Mesenger Law Firm, LLC, Beltsville, MD), on brief, for Appellants.

Dana Lee Dembrow, Sykesville, MD, on brief; Richard C. Murray, Westminster, MD, on brief, for Appellees.

Argued Before BELL, C.J., RAKER, WILNER *, CATHELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

BELL, Chief Judge.

The instant case concerns the election of local public officials in the State of Maryland. Specifically, at the core of this action is the issue of the authority of the Circuit Court for Carroll County, by its approval of an agreement ("Consent Order") between a private party and an executive agency, to modify the method of election of Carroll County commissioners.[1] Article VII of the Maryland Constitution, captioned "Sundry Officers," governs the method of election of commissioners in a county commissioner form of local government. It provides:

"Section 1. The County Commissioners of each county not governed by Article XI–A of this Constitution [2] may be elected by the voters of *commissioner districts established*

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. There are three forms of local county government in Maryland: charter, *see* Article XI–A of the Maryland Constitution entitled "Local Legislation;" code home rule, *see* Article XI–F of the Maryland Constitution captioned "Home Rule for Code Counties;" and commissioner, *see* Article VII of the Maryland Constitution titled "Sundry Officers," infra. Carroll County's is the "commissioner" form of local government.

2. Article XI–A of the Maryland Constitution entitled "Local Legislation" provides for the formation and regulation of a charter system of government. As pertinent, Sections 1 and 1A outline the procedures involved in forming a charter. Section 2 provides for a grant of power to charters from the General Assembly. The Article further provides, in Section 3, for the formation of a legislative body, *i.e.* a "City Council" or "County Council," in which the law-making powers of the charter are to be vested, while Section 3A provides for the method of election of the members of that body. Sections 4, 5, and 6 address the law-making powers of the elected legislative body, as well as the voters, including any amendments to the charter.

*therein,* or by the voters *of the entire county [at-large],* or by a combination of these methods of election, *as provided by the General Assembly by* law."

"Section 2. The number, compensation, and powers and duties of the County Commissioners of each county not governed by Article XI–A of this Constitution shall *be such as now are or may be hereafter prescribed by law.*"

(Emphasis added). Because we conclude that, as ordained by the Constitution, the power and authority to designate the method of election ultimately, and exclusively, lies with the Legislature, we shall hold that the Circuit Court's approval of the Consent Order authorizing a change in the method of election of county commissioners was a clear violation of Article VII, §§ 1 and 2 of the Maryland Constitution.

## I.

In the case sub *judice,* the Carroll County Board of Elections ("the Board"), in an attempt to expand the number of county commissioners in order to implement district, instead of at-large, representation, entered into a Consent Order with Dana Lee Dembrow ("Dembrow"), a registered voter in Carroll County, Maryland. Under that Consent Order, the County committed to the adoption of a redistricting plan creating five commissioner districts in the County, and, thus, in effect, to create a new method of election of commissioners for the November 7, 2006 General Election.

Carroll County currently has, and has had since its formation,[3] a commissioner form of government, with three county commissioners. The three persons elected to serve on the

---

**3.** *See* Chapter 256, Acts of 1835 (confirmed by Chapter 19, Acts of 1836; ratified January 19, 1837), which provides, as pertinent:

"An act for the division of Baltimore and Frederick Counties, and for erecting a new one by the name of Carroll, and to alter and change the Constitution of this State, so far as may be necessary to effect the same. WHEREAS, a considerable body of the inhabitants of Baltimore and Frederick counties, by their petition to this General Assembly, have prayed that an act may be passed for a division of said counties, and for erecting a new one out of parts thereof; and whereas, it appears to this General Assembly, that the erecting of a

County's Board of Commissioners historically were elected at-large. In 2003, however, House Bill 290 (2003), mandating the expansion of the Carroll County Board of Commissioners ("the CCBC") from three members to five, providing for their election by district, rather than at-large, *and* establishing a process for the creation of five commissioner districts in the County, was introduced in the Maryland General Assembly, adopted by both houses and signed by the Governor, as Chapter 417, 2003 Laws of Maryland. Section 2 of Chapter 417 conditioned the Act's becoming effective on its approval by referendum of the legally qualified voters of Carroll County at the next general election.[4] The Act was referred at the 2004 General Election, and it was approved by Carroll County voters and codified as Public Local Laws of Carroll County § 3–101. As enacted, the legislation provided, as relevant:

> new county out of such parts of Baltimore and Frederick counties, will conduce greatly to the ease and convenience of the people thereof: —— Therefore,
> "SECTION 1. Be it enacted by the General Assembly of Maryland, That after the confirmation of this act, such parts of the aforesaid counties of Baltimore and Frederick, . . . shall be erected into a new county, by the name of Carroll county, and that the Seat of Justice thereof be established at Westminister.
> "SEC. 2. And be it enacted, That the inhabitants of Carroll county, shall have, hold, and enjoy all the immunities, rights, and privileges enjoyed by the inhabitants of any other county in this State."

**4.** *See* Chapter 417, 2003 Laws of Maryland (ratified May 22, 2003), which provides, in pertinent part:
> "SECTION 2. AND BE IT FURTHER ENACTED, That before this Act becomes effective it shall first be submitted to a referendum of the legally qualified voters of Carroll County at the general election to be held in November 2004. . . . If a majority of the votes cast on the question 'For the referred law' the provisions of this Act shall become effective . . . *on the 30th day following the official canvas of votes for the referendum.* If the majority of the votes cast on the question are 'Against the referred law' the provisions of this Act are of no effect and null and void." (Emphasis in original).

At oral argument in this Court, there was some discussion as to whether the General Assembly's deferral to the voters of Carroll County of its authority to indeed enact the referred law was in accordance with its constitutional charge to create laws as part of a representative form of government. That issue, however, was not raised by the parties; thus, we decline to address it.

"(a) The Board of County Commissioners for Carroll County *consists of five Commissioners to be elected by Commissioner District.*

\* \* \*

"(c) *Redistricting Committee.*

"(1) On or before May 1, 2005, and on or before May 1 following the release of each decennial census of the United Stated thereafter, the County Commissioners shall appoint a Commission Redistricting Committee.

"(2) (i) The Commission Redistricting Committee shall consist of seven members.

"(ii) Of the seven members:

"1. Three shall be recommended by the County Republican Central Committee;

"2. Three shall be recommended by the County Democratic Central Committee; and

"3. One shall be recommended by the County Board of Elections.

"(3) The Commission Redistricting Committee *shall recommend:*

"(i) The establishment of five Commissioner districts in the county of substantially equal population; and

"(ii) Provisions for staggered terms of office for the Board of County Commissioners.

"(4) On or before December 1, 2005, and on or before December 1 following the release of each decennial census of the United States thereafter, the Commission Redistricting Committee *shall report its recommendations to the Carroll County Legislative Delegation to the General Assembly for consideration at the following legislative session.*"

(Emphasis added).

As § 3–101 required, and in accordance with its prescription, the incumbent members of the CCBC appointed the seven members [5] of the Commission Redistricting Committee

---

**5.** The seven members of the Committee were Thomas V. McCarron, Phillip R. Miller and Martin Radinsky, representing the Carroll County

("the Committee"). The Committee's function was *to make recommendations* to the Carroll County Legislative Delegation ("the Delegation") as to the boundaries of the proposed five commissioner districts, "for consideration at the following legislative session."

The Committee drafted two alternative redistricting plans, designated as Option 1 ("the Wheatley Plan") and Option 2. Under Option 1, or the Wheatley Plan, Carroll County was divided into a central Westminister district; a northern district consisting of Taneytown and Manchester; a southwestern district consisting of New Windsor, Union Bridge and Mount Airy; a southeastern district consisting of Sykesville and Eldersburg; and an eastern district consisting of Hampstead and Finksburg. Under Option 2, the five districts created were a central Westminister district; a northeastern district containing Hampstead and Manchester; a northwestern district containing Taneytown, New Windsor and Union Bridge; a southwestern district containing Mount Airy and Sykesville; and a southeastern district containing Eldersburg and stretching from the Howard County line to the south side of Md. 140. In this delineation, Finksburg was split between the northeastern and southeastern districts. These plans were the subject of several public hearings, at which the Committee solicited and received input from the Carroll County citizenry.

At its final meeting on June 30, 2005, by a vote of 4 to 2,[6] the Committee adopted and, therefore, recommended Option 2. It completed and submitted its Final Report, including the Committee's Guidelines, minutes of both its meetings and the

---

Democratic Central Committee; Joseph M. Getty, David R. Peloquin and Maurice E. Wheatley, representing the Carroll County Republican Central Committee; and Janet Jump, representing the County Board. Jump was later unanimously elected by the Committee to serve as its Chair.

**6.** The Committee's final vote was only 4 to 2 because Mr. Wheatley was absent for the June 30, 2005 meeting. The vote of the Committee was as follows: Getty—Option 1, Peloquin—Option 1, Radinsky—Option 2, McCarron—Option 2, Miller—Option 2 and Jump—Option 2.

public hearings, and map configurations, to the Carroll County Delegation on August 23, 2005.

Thereafter, the Carroll County Delegation held two public hearings on the Committee Report, one on October 25, 2005 and the other on December 13, 2005. At the latter meeting, the Delegation rejected the Committee's recommendation of Option 2 and adopted, instead, by a vote of 5 to 2, the Wheatley Plan.[7] The Wheatley Plan, as P.L.L. § 3–101(c)(4) required, was introduced, on January 30, 2006, "at the following legislative session," as House Bill 491. Due to the closeness of the election at which the plan was to be implemented, House Bill 491 was introduced as emergency legislation. Although it passed the House of Delegates and the Senate Education, Health and Environmental Affairs Committee ("the Senate Committee"), on sine die, the Maryland General Assembly adjourned without completing action on the bill.

In response to the Delegation's failure to secure the passage of House Bill 491 and acting on the advice of the Attorney General,[8] on April 17, 2006, the Board determined that the

---

7. There was some contention among the parties as to the Delegation's actions in approving the Wheatley Plan as opposed to the Committee's recommended Option 2. The appellants allege that the Delegation was "within its rightful powers" when it rejected Option 2, while the appellees assert that the Delegation was "required by statute to [ ] submit [the plan approved by the Committee] for consideration by the General Assembly." The appellees also posited that the Delegation took a vote "without discussion or debate." The language of P.L.L. § 3–101, *supra,* as enacted by the General Assembly at the time of the instant case, is unambiguous. The language clearly stated that "the Commission Redistricting Committee shall report its recommendations to the Carroll County Legislative Delegation to the General Assembly for consideration at the following legislative session." Nowhere in its language did § 3–101 mandate that the Committee's recommendations be adopted. We, therefore, agree with the appellants on this point and hold that the Delegation was in fact "within its rightful powers," under § 3–101, to reject the Committee's recommendation and substitute its own. In the same vein, the manner in which the Delegation's decision was made is irrelevant.

8. In response to an inquiry by Dana Tagalicod, a member of the Senate Committee, as to "how the 2006 elections for the Carroll County Commissioners would be handled if the delegation [were] unable to

election of the five county commissioners would be conducted at-large and not by district. It did so on the basis that no delineation of commissioner districts had been at the time lawfully created by the General Assembly.

## II.

Having learned of the Board's decision, Dembrow, the plaintiff below and one of the appellees in this appeal, filed, in the Circuit Court for Carroll County, a Complaint for Declaratory Judgment and Writ of Mandamus, naming the Board as defendant.[9] Specifically, Dembrow sought to compel the Board "to implement the directive of a certain voter referendum adopted by the voters of Carroll County, Maryland in November 2004 requiring the election of county commissioner by district in the 2006 elections." [10]

In response to Dembrow's Complaint, the Board held two emergency meetings to discuss the pending litigation, at the second of which Dembrow was in attendance. Having heard from Dembrow with regard to the nature of his Complaint

---

agree on a redistricting plan," Assistant Attorney General Kathryn Rowe of the legislative office of the Attorney General advised Ms. Tagalicod, in a letter dated February 27, 2006, that in "[Ms. Rowe's] view [ ] the election should be held and five commissioners elected from the County at large without districts." Ms. Rowe did acknowledge, however, that "it [was] also possible that districts could be established by a court," although she believed that "the shortness of time between [then] and the election [made that] option unlikely."

**9.** The Board was the sole defendant below but is one of two appellees in the case *sub judice.*

**10.** The language of the voter referendum which was placed on the November 2, 2004 General Election ballot, and subsequently approved by the Carroll County voters, read as follows:

"COUNTY QUESTION A—Referendum by General Assembly Election of the Board of County Commissioners: Proposing that the Board of Carroll County Commissioners be expanded from 3 members to 5 members and that the 5 members each be elected from Commissioner districts instead of at-large. Providing for the establishment of a Commission Redistricting Committee, appointed by the County Commissioners, to make certain recommendations to the Carroll County Legislative Delegation to the General Assembly."

and the relief he sought, the Board unanimously voted to enter into the Consent Order with Dembrow "to seek jointly at the earliest possible time an Order of the Circuit Court authorizing the conduct of [Carroll County] elections using commissioner district boundaries as designed, approved and recommended by the Redistricting Committee, also known as 'Option 2.'" The Circuit Court expedited its review of the Consent Order "in order to afford [the Board] as much time as possible to plan and conduct orderly elections in the fall of 2006 as required by law and dictated in part by a certain voter referendum...." Based solely on the "joint and abbreviated presentations by counsel," no notice to the public having been given and no evidentiary hearings having been held, the Circuit Court issued its Order approving the Consent Order and marking the action "as settled and dismissed with prejudice." As approved, the Consent Order provided, as pertinent:

"1. [The Board] withdraws its determination of April 17, 2006 to conduct the election of five (5) members of the Carroll County Board of Commissioners in the 2006 election at large rather than on the basis of districts.

"2. [The Board] agrees to conduct the 2006 election of five (5) members of the Carroll County Board of Commissioners by district rather than at large.

"3. [The Board] adopts the December 2005 recommendation of the Districting Committee also known as Option No. 2, and places the said adopted recommendation for Carroll County Commissioner districts in place for the 2006 election by determination of the Carroll County Board of Elections dated April 19, 2006."

On April 24, 2006, James Harris ("Harris"), for the purposes of appealing or filing motions for reconsideration, filed, pursuant to Maryland Rule 2–214,[11] a Motion to Intervene in the

---

11. Maryland Rule 2–214 (2007) provides, in relevant part:
"(a) *Of Right.* Upon timely motion, a person shall be permitted to intervene in an action: (1) when the person has an unconditional right to intervene as a matter of law; or (2) when the person claims

action. In that motion, he alleged "that there was no authority to pass [the Consent Order] as only the state legislature can set or delineate election district boundaries for County Commissioners." The following day, on April 25, 2006, Getty filed a Motion to Intervene as of Right for the Purpose of a Post–Judgment Appeal. Getty alleged that the Board did not have the authority to create commissioner districts, and, further, that the only power that the Board had was "to recommend the name of one member for appointment by the County Commissioners of Carroll County to the seven-member Commission Redistricting Committee, which power [had] been exhausted." Moreover, Getty posited that "the authority to create the five commissioner districts [was] reserved entirely to the legislative branch through action by the Maryland General Assembly." Finally, Getty submitted that "the [Cir-

---

an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.

"(b) *Permissive.* (1) Generally. Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.

\* \* \*

"(c) *Procedure.* A person desiring to intervene shall file and serve a motion to intervene. The motion shall state the grounds therefor and shall be accompanied by a copy of the proposed pleading setting forth the claim or defense for which intervention is sought. An order granting intervention shall designate the intervenor as a plaintiff or a defendant. Thereupon, the intervenor shall promptly file the pleading and serve it upon all parties."

In his brief, and at oral argument in this Court, appellee Dembrow raised the issue that neither Harris nor Getty's motions for intervention "was accompanied by a copy of the proposed pleading setting forth the claim for which intervention was sought, as required by the Rules of Civil Procedure," causing appellees to be "completely without notice and [to have to] rely solely upon conjecture, hearsay and conflicting press accounts." Dembrow's argument is, however, irrelevant in the case sub *judice*. Both motions for intervention were filed in the Circuit Court; therefore, it was up to that court to deny the motions. Moreover, the proper forum for Dembrow's objection was in that same court. Instead, both motions to intervene were unopposed. For these reasons, in addition to our disposition of the instant case on the merits, we do not address appellee Dembrow's procedural objection.

cuit] Court's Final Order of April 19, 2006, unlawfully and unconstitutionally impair[ed] and/or defeat[ed] the weight of . . . [his] vote [and] impair[ed] and defeat[ed] the ability to protect the interests of the public in securing the lawful adoption of a commissioner redistricting plan." Both motions were unopposed, and the Circuit Court granted them on April 25, 2006.

The following day, Harris noted an expedited appeal to this Court, which was later amended, on May 11, 2006, as a corrective notice of appeal to the Court of Special Appeals. On May 1, 2006, Getty also noted an appeal to the Court of Special Appeals. He then filed, on May 4, 2006, a Motion to Stay the Circuit Court's Order pending appeal, in which Harris joined, reiterating his intervention arguments and claiming, in addition, that Dembrow's Complaint was improper because both forms of relief requested could not be granted. They averred that the issuance of a writ of mandamus was improper on the basis that the Circuit Court could not compel the Board to adopt a redistricting plan since the Board does not have the power to create district lines, while a motion for declaratory relief was baseless once the Board agreed to the Consent Order. In response, Dembrow filed an opposition to the motion to stay the Circuit's Court ruling and a Motion to Dismiss, or in the alternative, to Transfer the Appeal to the Court of Appeals for Expedited Review. The Circuit Court denied the intervenors' Motion to Stay, holding that it "would not promote the expeditious resolution of this matter."

This Court, on its own initiative, issued a Writ of Certiorari on May 15, 2006. *Getty and Harris v. Board of Elections,* 392 Md. 727, 898 A.2d 1006 (2006). Oral Argument was heard on June 1, 2006, and, on that same day, the Court issued its Order vacating the judgment of the Circuit Court and remanding the case to that court "with directions to order the Carroll County Board of Elections that, in the absence of an enactment by the General Assembly of Maryland, pursuant to Article VII, §§ 1 and 2 of the Maryland Constitution, of new legislation for the election of Carroll County Commissioners in the 2006 elections, the 2006 elections of Carroll County Com-

missioners shall be in accordance with § 3–101(a) of the Public Local Laws of Carroll County as that subsection provided immediately prior to the passage of Chapter 417, 2003 Laws of Maryland," *i.e.* the election of three county commissioners at-large. We now set forth the reasons for that Order.

## III.

The appellants, in this Court, as they did in the Circuit Court, argue that the Circuit Court erred in approving the Consent Order between Dembrow and the Board creating commissioner districts in Carroll County. They proffer three theories. At the core of their argument is the separation of powers doctrine. The appellants, citing to this Court's past redistricting cases, *In re Legislative Districting,* 370 Md. 312, 805 A.2d 292 (2002); *Legislative Redistricting Cases,* 331 Md. 574, 614, 629 A.2d 646, 666 (1993); *In re Legislative Districting,* 299 Md. 658, 672–81, 475 A.2d 428 (1984) and *In re Legislative Districting,* 271 Md. 320, 317 A.2d 477 (1974), claim that the authority to create districts for political offices is a uniquely legislative function, one which should not, and is not permitted to be, under the separation of powers doctrine, infringed upon by the judiciary. The appellants asseverate further that "[t]he Board also lacked authority to establish such districts and ... was bound to conduct the election on an at large basis absent some form of *appropriate* judicial intervention." (Emphasis added).

First, the appellants assert that the Circuit Court's actions "improperly usurped the legislative function required by Section 3–101 of the Code of Public Laws of Carroll County." The appellants also take issue with the Circuit Court's failure to hold an evidentiary hearing after notice of the Complaint to the Delegation or, more important, to the citizens of Carroll County, and with the Circuit Court's "blindly accept[ing] ... at face value a purported consent disposition on [an] issue with countywide ramifications that had been reached between only two parties[,]" the effect of which, in essence, was the promotion of "a private individual and a ministerial agency [ ] into a legislative body responsible for deciding the countywide commissioner districts." Accordingly, they urge this Court to

nullify the Circuit Court's Order and, instead, give deference to the Delegation's endorsement of the Wheatley Plan and to instruct the Circuit Court to adopt said plan.

■ The second theory upon which the appellants base their argument concerns "basic due process principles and precedent established by Maryland's courts for addressing redistricting issues." Specifically, the appellants posit that the Circuit Court should have adhered to the "fair and open process for the consideration of disputes over redistricting" that has been established by this Court, including, but not limited to, "the ability for anyone who is aggrieved to petition the Court with specific challenges to [a given] redistricting plan, the appointment of a Special Master as a fact-finder, and a hearing to allow all sides of the challenge to be heard." It is the appellants' contention that, in hastily approving the Consent Order, the Circuit Court disregarded this process altogether.[12] In addition, the appellants assert that the Circuit Court should have afforded "local courtesy"[13] to the Delega-

---

12. In their brief, the appellants offer a timeline to illustrate the Circuit Court's "haste":

"Review of the record in this matter reveals that:
"a) The Complaint was stamped "received" by the Clerk of the lower court at 9:31 a.m. on April 19, 2006;
"b) No answer to the Complaint was filed nor was any Entry of Appearance of counsel filed on behalf of the Board;
"c) After the Complaint was filed, an unscheduled meeting of the Board occurred at which the "settlement accord and agreement was apparently approved;
"d) No hearing was conducted on April 19, 2006 nor was any evidence—including the actual map delineating the boundaries of "Option 2" as referred to in the Order—presented to the lower court;
"e) Despite the lack of any hearing or evidence, a chambers conference apparently occurred at which the lower court was advised of the "settlement accord and agreement" and, presumably, requested to sign the proposed Order which had been prepared by Dembrow;
"f) The lower court signed the Order and it was stamped "received" by the Clerk of the lower Court at 4:36 p.m. on April 19, 2006. "In sum, the instant matter was before the lower court from start to finish for less than eight (8) hours between filing of the Complaint and issuance of the Order."

13. "Local courtesy" is an unwritten, commonly observed custom where the members of both the House and the Senate of the General Assembly

tion's approved plan (the Wheatley Plan), as opposed to simply accepting and authorizing the plan to which the appellees consented. The Wheatley Plan, according to the appellants, should have been the Circuit Court's "point of beginning," when reviewing Dembrow's Complaint. Consequently, in the appellants' view, the Circuit Court's recognition of the Wheatley Plan would have required Dembrow, and the Board to challenge the plan's constitutionality, to point out any infirmities it may have or why its adoption was improper.

The appellants final theory finds its basis in the Maryland Uniform Declaratory Judgments Act ("the DJA") of Maryland Code (1974, Repl. Vol. 2006) §§ 3401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"). Specifically, the appellants asseverate that "[t]he lower court's Order is a complex amalgamation of forms of relief, none of which satisfy the statutory prerequisites for issuing a declaratory judgement as set forth in the [Act]." The appellants maintain that the Act is "remedial in nature" and intended to settle matters involving "uncertainty and insecurity." [14] Moreover, the appellants emphasize the adversarial nature of the Act and claim that it was not satisfied below because there existed no controversy between the parties once they entered into an agreement to extinguish the Complaint.[15] The Circuit Court, thus, could not

---

defer to the representatives of a particular jurisdiction, i.e. a county's local legislative delegation, on matters affecting only that district. Pursuant to the local courtesy practice, once legislation affecting a certain singular jurisdiction is approved and recommended by that jurisdiction's local delegation, the members of the General Assembly vote unanimously in support of such legislation, preferring to leave local issues to local leaders.

**14.** *See* CJP § 3–402, which provides:

"This subtitle is remedial. Its purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. It shall be liberally construed and administered."

**15.** *See* CJP § 3–409(a), which provides:

"(a) *In general.*—Except as provided in subsection (d) of this section, a court may grant a declaratory judgment or decree in a civil case, if

have granted the relief requested by Dembrow and should have dismissed the action since, as the appellants submit, "litigants in a pending civil lawsuit may [not] obtain a 'declaratory judgment' by consent." Similarly, the appellants argue that the court failed to adhere to the applicable rules for issuing a writ of mandamus, and that if its order could be construed as such that it "was entirely inappropriate." [16]

Finding no flaw in the Circuit Court's approval of the Consent Order, the appellees, not surprisingly, take the contrary view and urge this Court to enforce the Consent Order. The appellees' main argument, although based on different theories,[17] is that the Circuit Court did not err in its

---

it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
"(1) An actual controversy exists between contending parties;
"(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
"(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it."

16. As below, the appellants argument that a writ of mandamus was inappropriate is based primarily on the fact that the Circuit Court could not compel the Board to create district lines, as such a task is outside the purview of the Board's authority. Our discussion of both the Board's and the Circuit Court's authority, *infra,* serves to address this issue raised by the appellants. As such, we will not specifically address the appellants' mandamus argument.

17. While their arguments for why the Circuit Court's Order should be affirmed are based on different grounds in their briefs, at oral argument, the Board adopted appellee Dembrow's arguments in addition to its own. On brief, the Board argued that the Circuit Court's approval of the Consent Order was proper because the Board had the statutory authority not only to enter into the agreement with Dembrow, but to create district lines for the upcoming elections. In asserting this position, the Board equated the creation of district lines to the creation of precinct lines or boundaries. It relied on Maryland Code (2003, 2006 Cum. Supp.) §§ 2–202(b)(6) and 2–303(a)(1) of the Election Law Article, which provide, as relevant:

"(b) *Powers and duties.*—Each local board, in accordance with the provisions of this article and regulations adopted by the State Board, shall:
* * *

"(6) establish and alter the boundaries and number of precincts in accordance with § 2–303 of this title, and provide a suitable polling place for each precinct, and assign voters to precincts[.]"

"(a) *In general.*—(1) Subject to paragraph (2) of this section, as it deems it expedient for the convenience of voters, a local board may:

"(i) create and alter the boundaries for precincts in the county;

"(ii) designate the location for polling places in any election district, ward, or precinct in the county; and

"(iii) combine or abolish precincts."

The Board also relied on a number of Attorney General Opinions. *See* 35 Opinions of the Attorney General 167 (1950) (noting the action of an election board "establishing new election districts"); 16 Opinions of the Attorney General 121 (1931) (noting the authority of a local board to "sub-divide" election districts and precincts); 56 Opinions of the Attorney General (recognizing the power of election officials to either sub-divide of change the boundaries of precincts).

Although not specifically at issue in the case sub *judice,* the Board's argument deserves some comment. The Board's reasoning is a stretch at best. As defined in *Black's Law Dictionary,* a "precinct" is "a *geographical unit* of government, such as an election district, a police district, or a judicial district," while a "district" is defined as "a territorial area into which a country, state, county, municipality, or other political subdivision is *divided for judicial, political, electoral, or administrative purposes." Black's Law Dictionary* goes on to define a "legislative district" as "a geographical subdivision of a state *for the purpose of electing legislative representatives."* (Emphasis added).

To be sure, in the context of election matters, a precinct is the place one may go in order to cast one's vote, while a district constitutes the number of persons a particular legislator or appointee may legally represent in a particular jurisdiction based on the apportionment of the jurisdiction. A district, although also a "geographical" area in the literal sense of the word, has much more significance than a precinct, and its creation is not within the purview of local elections boards. Indeed, the redistricting of a state, as discussed in greater detail later in this opinion, is primarily a legislative task and should be left to that branch of the State's government.

Notwithstanding the various "interpretations" made by the Attorney General, authority which it is important to note is not binding on this Court, see *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.,* 395 Md. 299, 327, 910 A.2d 406, 423 (2006), *citing Dodds v. Shamer,* 339 Md. 540, 556, 663 A.2d 1318, 1326 (1995); *Drew v. First Guar. Mortg. Corp.,* 379 Md. 318, 332, 842 A.2d 1, 9 (2003) and cases there cited, the plain language of the statutes themselves refer to "precincts" not "districts." It is a basic canon of statutory interpretation that words should not be added to nor deleted from a provision. *See Abrams v. Lamone,* 398 Md. 146, 174, 919 A.2d 1223, 1240, *quoting Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003); *Condon v. State of Maryland–Univ. of Maryland,* 332 Md. 481, 491, 632 A.2d 753, 758 (1993), *quoting Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986). We have, moreover, stated that our interpretation of statutes should not lead to absurd results. *Abrams,* 398 Md. at 187, 919 A.2d at 1248, *citing Montgomery County Comm'rs v. Supervisors of Elections of Montgomery County,* 192 Md. 196, 208, 63 A.2d 735, 740 (1948); *Comptroller*

*Treasury v. John C. Louis Co.*, 285 Md. 527, 539, 404 A.2d 1045, 1053 (1979). Following the Board's logic, giving local boards of elections the authority to create county districts, the State Board would be permitted to redistrict the State. We reject the Board's argument incorporating into §§ 2–202(b)(6) and 2–303(a)(1) of the Election Law Article the word "district." Thus, the only authority vested in the Board under those provisions is to delineate precincts lines or boundaries, not district lines. That function is primarily ministerial and intended to facilitate the elections process.

Moreover, this Court has stated, while recognizing the essential function of administrative agencies, such as the Board, within the State's operation, that we are "bound to ensure that those agencies act within the confines of their delegated power." *Benson v. State*, 389 Md. 615, 646, 887 A.2d 525, 543 (2005). *See Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 701, 684 A.2d 804, 814 (1996) (Bell, J., dissenting) ("An administrative agency, as a creature of statute, has only the power its enabling statute delegates to it"); *Holy Cross Hosp. of Silver Spring, Inc. v. Health Srvcs. Cost Review Comm'n*, 283 Md. 677, 683, 393 A.2d 181, 184 (1978) ("[An administrative agency] has no inherent powers and its authority thus does not reach beyond the warrant provided it by statute"). *See also Phelps Dodge Corp., v. Nat'l Labor Relations Bd.*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (the primary function of an administrative agency is to carry out the will of the State as enunciated in the legislation creating it). The right of the Legislature to delegate powers to administrative agencies long has been recognized in this State. *Harrison v. Mayor & City Council of Baltimore*, 1 Gill 264 (1843). However, "a legislatively delegated power to make rules and regulations is administrative in nature, and it is not and can not be the power to make laws; it is only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered." *Ins. Comm'r v. Bankers Indep. Indus. Co.*, 326 Md. 617, 624, 606 A.2d 1072, 1075 (1992). *See also Mayor and City Council of Baltimore v. William E. Koons, Inc.* 270 Md. 231, 236–37, 310 A.2d 813, 816–17 (1973), *quoting* 1 Am.Jur.2d Administrative Law § 132 (1962).

Consistent with the foregoing, we agree with the appellants that, under P.L.L. § 3–101, the Board did not have the authority to enter into the Consent Order modifying the method of election in Carroll County, and, thus, creating new districts in the County. As the appellants point out correctly, the *only* delegated power granted to the Board was to, in fact, appoint one member to the Committee in order to craft a redistricting plan to submit to the Delegation. Its actions were, thus, a clear "contradict[ion of] the Legislature's *express language or purpose* in enacting the statute." *Benson v. State*, 389 Md. at 645, 887 A.2d at 542, *citing Lussier*, 343 Md. at 688, 684 A.2d at 807 (emphasis added); *Christ by Christ v. Dep't of Natural Resources*, 335 Md. 427, 438, 644 A.2d 34, 39 (1994).

approval of the agreement between them because, according to them, the court had, indeed, the authority to approve the Consent Order, "without abridging the notion that the judicial branch ought not to inject itself into matters reserved solely for legislative or executive branch prerogative, and ought not inject itself into purely political matters at all," thus making the Consent Order binding on the Board and its conduct of the Carroll County elections for county commissioners.

The appellees argue that the General Assembly satisfied the requirements prescribed in Article VII of the Maryland Constitution for modifying the method of election of county commissioners when it adopted House Bill 290. They assert that, by enacting House Bill 290, without regard to the voter referendum provision, the General Assembly expressed its intention on the subject; "by law," it provided for the election of five, instead of three, county commissioners and for their election by district, rather than at-large, in the 2006 election, subject only to the condition that the bill be approved by the Carroll County electorate. Once that condition was met, they maintain, "the legislation became fully effective and five Carroll County commissioners [were to] be elected in 2006 by district."

Relying on Maryland Code (2003, 2006 Cum. Supp.) § 12–202(a) of the Election Law Article and Maryland Code (1973, Repl. Vol. 2006) § 3–409 of the Courts and Judicial Proceedings Article, the appellees asseverate further that the Circuit Court properly authorized the Consent Order. Indeed, they submit that the court not only was authorized, but it was compelled, by both § 3–101 and the failure of the General Assembly to delineate district lines, to "set the districts and Order the Board of Elections to comply with the requirements of law."

With regard to the speed with which the Circuit Court considered the issue, the appellees assert that, given the timing of the filing of the action, the deliberations that already had elapsed and the imminence of the general election, only months away, with its various procedural and filing deadlines, it was imperative for the Circuit Court to act when, and in the

manner that it did to ensure the orderly conduct of that election. In any event, the appellees proffer that the Circuit Court did no more than it was required to do, simply approve the Consent Order, there having already been, over the course of the previous approximately three years, legislation by the General Assembly, a voter referendum, "formal meetings" of both the Committee and the Delegation on the matter and "extensive public debate."

## IV.

Before turning to the merits of this case, it is important to review the two principles underlying the issue involved-separation of powers and redistricting. We will touch briefly on both these subjects.

## A.

Maryland's separation of powers jurisprudence has its origin in the State's first Constitution. Thus, the doctrine is a part of the State's organic law. Found specifically in Article 6 of the Declaration of Rights of the Maryland Constitution of 1776, and dividing the powers of the state government into three departments, it mandated that the "legislative,[18] executive[19] and judicial powers[20] of government ought to be for ever separate and distinct from each other." In 1851, with the adoption of a new constitution, that language was incorporated, and expanded, to explicitly prohibit one branch of government from assuming or usurping the power of any other branch. As adopted in 1851, and as provided in the current Maryland Constitution,[21] Article 6 of the Maryland Declaration of Rights provided:

---

**18.** *See* MD CONST. art. III.

**19.** *See* MD CONST. art. II.

**20.** *See* MD CONST. art. IV.

**21.** The current iteration of Article 6 of the Maryland Declaration of Rights, which has remained unchanged since 1851, can be found at Article 8 of the Maryland Declaration of Rights.

"That the legislative, executive and judicial powers of government ought to be for ever separate and distinct from each other; and no person exercising the functions of one of said departments shall assume or discharge the duties of any other."

This Court has long recognized, and frequently discussed, the general maxim of the separation of powers. As early as 1829, we stated:

"The Constitution of this State, composed if [sic] the Declaration of Rights and form of government, is the immediate work of the people, in their sovereign capacity, and contains standing evidences of their permanent will. It portions out supreme power, and assigns it to different departments, prescribing to each the authority it may exercise, and specifying that from the exercise of which it must abstain. The public functionaries move then in a subordinate character, and must conform to the fundamental laws or prescripts of the creating power. When they transcend defined limits, their acts are unauthorized, *and being without warrant,* are necessarily to be viewed as nullities."

*Crane v. Meginnis,* 1 G. & J. 463, 472 (1829) (emphasis added); *see also, e.g., Schisler v. State,* 394 Md. 519, 549–79, 907 A.2d 175, 193–211 (2006) (providing a detailed history and evolution of the separation of powers doctrine), and cases cited therein; *Wright v. Wright's Lessee,* 2 Md. 429 (1852) (elucidating the purpose of the separation of powers doctrine).

While recognizing that distinct demarcations exist in the lines of authority of our State's government, we have also acknowledged that the departments are not *"wholly* separate and unmixed." *Crane,* 1 G. & J. at 476 (emphasis in original). Instead, the powers of the State government are "blended and mingled together." *Id.* We made the point recently in *Benson v. State,* 389 Md. 615, 644, 887 A.2d 525, 542 (2005), when we observed that "[t]his Court has repeatedly pointed out that Article 8 of the Maryland Declaration of Rights does not impose a complete separation between the branches of government[,]" *quoting Christ by Christ v. Dep't of Natural Re-*

*sources,* 335 Md. 427, 441, 644 A.2d 34, 40 (1994); *McCulloch v. Glendening,* 347 Md. 272, 283, 701 A.2d 99, 104 (1997); *Judy v. Schaefer,* 331 Md. 239, 261, 627 A.2d 1039, 1050 (1993); *Dep't of Trans. v. Armacost,* 311 Md. 64, 81, 532 A.2d 1056, 1064 (1987). *See also, e.g., Dep't of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975) ("[T]he separation of powers concept may constitutionally encompass a sensible degree of elasticity and should not be applied with doctrinaire rigor"); *Baltimore v. State,* 15 Md. 376, 459 (1860) ("In considering the question as to the separation of the departments, we are to bear in mind that the Declaration of Rights is not to be construed by itself, according to its literal meaning; * * * entire practical separation was not designed"); 1 F. Cooper, *State Administrative Law* 15 (1965) ("[T]he doctrine of separation of powers does not forbid the exercise by one department of powers that could appropriately be exercised by another department ... there may be a 'blending' of disparate powers").

Notwithstanding our acknowledgment that the separation of powers doctrine does not impose, in every circumstance, a complete separation between the three branches of this State's government, we have also made clear that the "constitutionally 'elasticity' [of the doctrine] cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power, as the Maryland Constitution does not permit a merger of the three branches...." *Schisler v. State,* 394 Md. at 576, 907 A.2d at 208, *quoting Linchester Sand & Gravel Corp.,* 274 Md. at 220, 334 A.2d at 521; *Lussier v. Maryland Racing Comm'n,* 343 Md. 681, 706, 684 A.2d 804, 816 (1996) (Bell, J., dissenting). This follows the purpose of the doctrine which we have held to be "to preserve[ ] to the one branch of government its *essential* functions and prohibit[ ] any other branch from interfering with it or usurping those functions[.]" *McCulloch,* 347 Md. at 283, 701 A.2d at 104, *quoting O'Hara v. Kovens* 92 Md.App. 9, 22–23, 606 A.2d 286, 292, *cert. denied* 328 Md. 93, 612 A.2d 1316 (1992) (emphasis and brackets in original).

## B.

This Court has had several opportunities to consider redistricting matters, albeit pertaining to the legislative redistricting of the entire State. While the case *sub judice* concerns the redistricting of local county districts, it is our view that the same principles which apply to legislative redistricting apply with equal force here; the purpose of both is the same, *i.e.* to reflect the changes and shifts in a particular jurisdiction's population.

We stated in *In re Legislative Districting of the State*, 370 Md. 312, 319, 805 A.2d 292, 296 (2002), heeding the rationale underlying the "one-person, one-vote" standard,[22] enunciated by the Supreme Court in the landmark decision in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), that "a fairly apportioned legislature lies at the very heart of representative democracy." As such, it is imperative that the rights of the State's citizenry are particularly protected when it comes to the drawing of districts lines.

---

**22.** Governed by the Equal Protection Clause of the Fourteenth Amendment, and described as the "sine *qua* non of fair representation," *In re Legislative Districting*, 299 Md. 658, 672, 475 A.2d 428, 435 (1984); *see Maryland Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), the one-person/one-vote standard concerns population equality in the redistricting process, its purpose being to ensure the proportionate representation of voters and the adequate consideration of their interests by the Legislature. *See Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964) ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable"). *See also Karcher v. Daggett*, 462 U.S. 725, 732–33, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133, 142 (1983); *White v. Weiser*, 412 U.S. 783, 790, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335, 343 (1973); *Gray v. Sanders*, 372 U.S. 368, 379–80, 83 S.Ct. 801, 808, 9 L.Ed.2d 821, 829 (1963) (recognizing the requirement of the federal Constitution that population equality be the primary redistricting consideration). In *McMillan v. Love*, we explained, "[i]f not for the one-person/one-vote requirement, districts could be drawn in such a fashion that the interests of a few would wield equal, if not greater, strength than those of the rest of the population." 379 Md. 551, 569, 842 A.2d 790, 801 (2004).

*See Maryland Comm. for Fair Representation v. Tawes*, 229
Md. 406, 411–12, 184 A.2d 715, 717–18 (1962) (recognizing that
political subdivisions are particularly critical taking into ac-
count the governance structure of the State of Maryland); *see
also Hughes v. Maryland Comm. for Fair Representation*,
241 Md. 471, 498–509, 217 A.2d 273, 289–295 (Barnes, J.,
dissenting), *cert. denied*, 384 U.S. 950, 86 S.Ct. 1569, 16
L.Ed.2d 547 (1966); *Legislative Redistricting Cases*, 331 Md.
574, 619–24, 629 A.2d 646, 669–71 (1993) (Eldridge, J., dissent-
ing); *see generally*, Matthew P. Andrews, *History of Mary-
land* 617 (1929) ("In the matter of representation Maryland
has been likened to a 'confederacy of counties,' or a federated
republic-the counties and the City of Baltimore ... being
comparable to the states in the federal Union"); Theodore J.
Maher, *State–County Relations in Maryland* 312–19 (1971)
(discussing the importance of county governments within the
organization of the State).

■ We have opined that the drawing of such lines is an
"intensely political process;"[23] however, due to the constitu-
tional standards that govern the process and the redistricting
plan which generally results from it, the process is also a legal
one.[24] *In re Legislative Districting*, 370 Md. at 320, 805 A.2d

---

**23.** *See generally, Abrams v. Johnson*, 521 U.S. 74, 117, 117 S.Ct. 1925,
1950, 138 L.Ed.2d 285, 322 (1997) (recognizing that the redistricting
process is "inherently political"); *Gaffney v. Cummings*, 412 U.S. 735,
753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298, 312 (1973) ("Politics and
political considerations are inseparable from districting and apportion-
ment.... The reality is that districting inevitably has and is intended to
have substantial political consequences"); Gene R. Nichol, Jr., *New
Challenges in Voting: the Practice of Redistricting*, 72 U. Colo. L.Rev.
1029, 1033 (2001) ("Redistricting ... is thoroughly and relentlessly
political").

**24.** The essential prerequisites of any redistricting plan can be found in
Article III, § 4 of the Maryland Constitution, which provides:
"Section 4. Each legislative district shall consist of adjoining territo-
ry, be compact in form, and of substantially equal population. Due
regard shall be given to natural boundaries and the boundaries of
political subdivisions."
*See also* Article III, §§ 2, 3 and 5 of the Maryland Constitution, which
provide, as pertinent:

at 296. Although this Court is charged, "upon petition of any registered voter," to review a given redistricting plan to insure that it conforms with constitutional requirements and to grant the appropriate relief, *i.e.* the promulgation and adoption of our own plan,[25] if the plan does not, it is well settled that the

"Section 2. The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates."

"Section 3. The State shall be divided by law into legislative districts for the election of members of the Senate and the House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district."

"Section 5. Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing of the members of the Senate and the House of Delegates.

"The Governor shall present the plan to the President of the Senate and the Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly[.] ... Following each decennial census the General Assembly may by joint resolution adopt a plan setting forth the boundaries of the legislative districts for the election of members of the Senate and the House of Delegates, which plan shall conform to Sections 2, 3 and 4 if this Article. If a plan has been adopted by the General Assembly by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the plan adopted by the General Assembly shall become law. If no plan has been adopted by the General Assembly for these purposes by the 45th day after the opening of the regular session of the General Assembly in the second year following the census, the Governor's plan presented to the General Assembly shall become law.

"Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

**25.** This Court has on two occasions declared a redistricting plan unconstitutional and promulgated its own. We first did so in *In re Legislative Districting*, 271 Md. 320, 317 A.2d 477, *cert. denied sub. nom. Twilley v. Governor of Maryland*, 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974) where we held the State's plan invalid for failure on the part of the Governor to hold the requisite "public hearings" pursuant to Article III, § 5 of the Maryland Constitution. Most recently, in 2002, in *In re*

redistricting of a territory is primarily, and ultimately, a legislative function. *See In re Legislative Districting*, 370 Md. at 326, 805 A.2d at 300 ("[I]t is the responsibility of ... the Legislature ultimately, if it chooses to act, to draw the legislative districts. [If a redistricting plan] meets constitutional muster, [it] will not be, indeed, cannot be, second guessed by the Court"); *In re Legislative Districting*, 299 Md. 658, 688, 475 A.2d 428, 443 (1984) ("Essentially, the districting process is a political exercise for determination by the legislature and not the judiciary ...."); *see also LaPorte County Republican Cent. Comm. v. Bd. of Comm'rs of County of LaPorte*, 43 F.3d 1126, 1130 (7th Cir.1994) ("[P]olitical decisions [should] be left in the main to the political (elected) branches of government rather than to the judiciary, even when the political decisions affect elections").

 While the legislature is charged with the crafting of the plan itself, it is our responsibility, as prescribed by Article III, § 5 of the Maryland Constitution and as final arbiter, to review its constitutionality. When a redistricting plan that has been adopted, either by the Governor or the Legislature, is challenged, our inquiry begins by first looking at the plan on its face and taking into consideration whether, in light of the specific challenges, both federal and state legal requirements have been met. In *In re Legislative Districting*, we articulated the process:

> "When, from the petitions and the answers alone, we perceive deviations that do not appear to be permissible, but for which there may be some explanation that could serve to justify them, we have appointed a special master, thus affording the State and the petitioners the opportunity to present evidence and argument to supply that explanation. Following those proceedings, if we conclude that the deviations are within a permissible range or for a permissible

---

*Legislative Districting, supra,* this Court held that the State's legislative redistricting plan violated the constitutional requirements of due regard for natural and political subdivisions boundaries, as prescribed by Article III, § 4 of the Maryland Constitution.

purpose, we have approved the plan. On the other hand, if we are satisfied that, despite the proffered explanation, the deviations are constitutionally impermissible, we have but one choice: declare the plan unconstitutional and void." 370 Md. at 322, 805 A.2d at 298.

■ To be sure, it is not this Court's charge to hold merely that a redistricting plan is invalid. If an adopted plan does not pass constitutional muster and is declared void, the Maryland Constitution requires us to do more-we must provide a remedy. There is no one remedy that is imposed in such cases, instead we evaluate the circumstance of each one on a case-by-case basis. When there is time to return the matter to the other political branches, giving them the opportunity to produce an amended, or even a new, plan, we have done so. When, however, there is the urgency of an upcoming election, we have chosen to fashion and adopt the redistricting plan ourselves.

## V.

Keeping in mind the above principles, we turn now to the merits of the case *sub judice*. The appellees rely on Article 8 of the Declaration of Rights of the Maryland Constitution, P.L.L. § 3–101 and CJP § 3–409 to support their position. We are not persuaded that any one, or a combination, of those authorities, imbued the Circuit Court with the power or authority to approve the Consent Order. Indeed, a stronger argument, a dispositive one, has been made, by the appellants in this case, that the Consent Order cannot be upheld on constitutional or statutory grounds.

■ The appellees urge this Court to accept that the General Assembly's inaction, in essence, compelled the Circuit Court to act, and effectively, if inadvertently, conferred on that court some semblance of authority to do so. This Court has held that "Article 8 [of the Declaration of Rights] prohibits the courts from performing non-judicial functions," *Consolidated Const. Servs., Inc. v. Simpson,* 372 Md. 434, 449, 813 A.2d 260, 269 (2002), *quoting Shell Oil Co. v. Supervisor of*

*Assessments of Prince George's County,* 276 Md. 36, 46, 343 A.2d 521, 527 (1975); *Sugarloaf Citizens Ass'n, Inc. v. Gudis,* 319 Md. 558, 569, 573 A.2d 1325, 1331 (1990). *See also Duffy v. Conaway,* 295 Md. 242, 254, 455 A.2d 955, 961 (1983) ("[A] court has no jurisdiction to perform a nonjudicial function. . . ."). More specifically, we have stated that the "[t]he judicial department ha[s] no jurisdiction or right to interfere with the legislative process which was committed by the constitution . . . to the Legislature itself." *Maryland–Nat'l Capital Park & Planning Comm'n v. Randall,* 209 Md. 18, 25, 120 A.2d 195, 199 (1956). It is clear that the provisions of the Consent Order agreeing "to conduct the 2006 election of five (5) members of the Carroll County Board of Commissioners by district rather than at large," and adopting "the December 2005 recommendation of the Districting Committee also known as Option No. 2, and plac[ing] the said adopted recommendation for Carroll County Commissioner districts in place for the 2006 election by determination of the Carroll County Board of Elections[,]" go beyond the functions of the judiciary, and, indeed interfere with the Legislature's authority to redistrict. In issuing its Order, the Circuit Court assumed a role that, in fact, constitutionally belongs to the legislative and executive departments of our government.

Article III, § 28 of the Maryland Constitution provides, in pertinent part, that "[n]o bill . . . shall become a Law unless it be passed in each House by a majority of the whole number of members elected. . . ." As previously discussed, House Bill 491 passed the House of Delegates, but failed to pass the Senate. Thus, there is no legislation at all to serve as the basis for the Consent Agreement. In *Watkins v. Watkins,* 2 Md. 341 (1852), this Court was faced with a similar situation. In that case, our predecessors were asked to issue a writ of mandamus compelling the incumbent Adjutant General to deliver all materials germane to the office to the petitioner, who was his presumed and designated, though not confirmed, successor. Article 9, § 2 of the 1851 Maryland Constitution, applicable to the office of Adjutant General, provided that, "the Adjutant General shall be appointed by the Governor, by and with the

consent of the senate . . . ." The petitioner was nominated by the Governor, but the petitioner did not receive the consent of the senate, as it failed to complete action on the nomination before the adjournment of the Legislature. The Court rejected the petitioner's argument that he was entitled to succeed to, and hold, the office and held, instead, that, as prescribed by the Constitution, absent the concurrence of both the Governor and the senate, the incumbent Adjutant General would continue his commission. The Court opined:

> "[W]e have only to observe, that in all human contrivances confidence must be reposed somewhere, and that under the distribution of the powers of government in our State, it is not given to the judiciary to *compel* action on the part of a co-ordinate branch of the government. Its authority is confined to *restraining* the potency of its enactments when they transcend constitutional limits."

2 Md. at 355 (emphasis in original).

More than a century later, this Court, once again, had the opportunity to address the separation of powers between the judiciary and the Legislature. In *Planning v. Randall, supra,* House Bill 505 was enacted by the General Assembly, but was subsequently vetoed by the Governor. Before the bill was returned to the House in which it originated for further action-it was thought that the bill would be passed over the Governor's veto-, an appeal was brought asking the Court to decide various questions of law pertaining to the bill. This Court, pointing out that legislative action had not been completed, stated, "[c]ertainly the Bill has not been *enacted.* . . . It could hardly be contended that after one House had passed a bill the courts could enjoin the submission of that bill to the other House on the allegation that the bill as passed by one House was unconstitutional or unlawful." 209 Md. at 26–27, 120 A.2d at 199 (emphasis in original). Accordingly, the Court dismissed the suit, holding that it lacked jurisdiction.

Our sister states are in accord. In *Goodland v. Zimmerman,* 243 Wis. 459, 10 N.W.2d 180 (1943), the court was asked to enjoin the Secretary of State from publishing an act enact-

ed by the Legislature. As prescribed by the Constitution of Wisconsin, a bill does not become effective as law until it is published. Thus, the Court declared:

"We are here dealing with a bill that has not yet become a law. There is no such thing known to the law as an unconstitutional bill. *A court cannot deal with the question of constitutionality until a law has been duly enacted and some person has been deprived of his [or her] constitutional rights by its operation.* In a proper case a court may declare whether the legislature has exceeded its constitutional powers in the enactment of the law complained of. \* \* \* If a court can intervene and prohibit the publication of an act, the court determines what shall be law and not the legislature. If the court does that, it *does not in terms legislate but it invades the constitutional power of the legislature to declare what shall be law. This it may not do.*"

10 N.W.2d at 183 (emphasis added). *See also State ex rel. Carson v. Kozer,* 126 Or. 641, 270 P. 513, 516 (1928) (holding that "[i]f [a] measure is unconstitutional, and should be adopted, the Constitution itself will require the courts, if the question is properly presented, to pronounce the measure to be unconstitutional; but the courts possess no such power as to any proposed bill before the same has become a law[.]"); *Kuhn v. Curran,* 184 Misc. 788, 792, 56 N.Y.S.2d 737 (N.Y.Sup.1944) (holding that "[i]t cannot be supposed that when any citizen reaches the opinion that a law is unconstitutional he may, without any actual controversy and before the law begins to become operative, sue a State officer for a declaration of invalidity. This would amount to insinuation of the views of the judicial branch of the government into the legislative field").

Under the principles set forth in the above cases, it follows that the General Assembly's failure to enact House Bill 491, and, thus, adopt a redistricting plan for Carroll County, did not somehow authorize the Circuit Court to act. These cases make clear, in fact, that the Circuit Court's actions transcended its jurisdiction, usurping the Legislature's function in the

process. To be sure, the Circuit Court, as a trial court, not being accorded any authority, either by Constitutional provision or through statutory law, has no jurisdiction to create district lines. Thus, it follows, the court could not, in light of the General Assembly's inaction, step in and create, through a consent order, a redistricting plan for Carroll County. In other words, the April 19, 2006 Consent Order could not confer jurisdiction on the Circuit Court where none otherwise existed. *See, e.g., Montgomery County v. Bradford,* 345 Md. 175, 206, 691 A.2d 1281, 1296 (1997) (Eldridge, J., dissenting) (noting that the fact that parties to an underlying litigation may consent to a decree cannot bring that litigation within the jurisdiction of the court) and cases there cited; *Price v. Hobbs,* 47 Md. 359, 378 (1877) ("[N]o consent of parties can confer power or jurisdiction on this Court").[26]

Consistent with the foregoing, it is not the place of this Court to adopt a redistricting plan for Carroll County. While we agree with the appellants that the Circuit Court's Order should be vacated, thus, rejecting the adoption of Option 2, we do not, in doing so, grant them the relief they seek, *i.e.* the adoption of the Wheatley Plan, or, in the alternative, permit the election of five commissioners at-large. Thus, it is clear that the judiciary, although permitted to act at certain junctures in the districting process, should not, otherwise interfere in the process. In other words, the power of judicial review does not equate to the power to exercise functions that are explicitly vested in the other organs of the government.

Because House Bill 491 was never enacted, we consider all actions thus far, including those on behalf of the Committee, the Delegation, and even the parties in this suit, to be mere recommendations. There simply is no plan for this Court to review. Thus, what we have is a question entrusted, in the first instance and exclusively, to the Legislature, *i.e.* its law-

---

**26.** In *Montgomery County v. Bradford,* 345 Md. 175, 207, 691 A.2d 1281,1296 (1997) Judge Eldridge, dissenting, observed: "If anything, a consent judgment involving a matter of public policy is more vulnerable than other judgments to a collateral challenge based on the lack of authority underlying the judgment."

making function to enact legislation and its power to redistrict. That being so, this Court is required, under the separation of powers doctrine, to give deference to the General Assembly's action, or, as in this case, inaction.

We note and emphasize that P.L.L. § 3–101 contemplated, and so provided, *inter alia*, that any redistricting plan adopted by the Carroll County Delegation was to be approved by the General Assembly. In addition, under Article VII, § 1 of the Maryland Constitution, the plan would have to be adopted by the General Assembly. The statute addressed two issues. Not only did it address the number of commissioners, providing for the election of five, but it also addressed how they would be elected, opting for district elections and providing for the drawing of five of them. The language of the statute did not, indeed could not, in any manner, confer jurisdiction on the Circuit Court; it did quite the opposite. Providing that "the Commission Redistricting Committee shall report its recommendations to the Carroll County Legislative Delegation to the General Assembly for consideration at the following legislative session," P.L.L. § 3–101 was explicit in its intent and left little room for interpretation in terms of where the authority to create a redistricting plan ultimately resided. The Legislature was very deliberate in its language; thus, we cannot simply determine, as both parties would urge us to do, that the election should consist of five commissioners, who, because there has been no delineation of district lines by the General Assembly, will be elected at-large.

The common theory upon which both parties rely for their argument that there should be the election of five commissioners is the fact that the voters of Carroll County, through referendum, expressed their desire to change the method of election in the County and authorized the appointment of a committee to consider and adopt, for recommendation to the Legislative Delegation, a redistricting plan. The desire of the parties, and even the electorate, is not dispositive, however, as there exists a clear demarcation between desire and authority to act. While the interests of the parties, as well as all those involved in the redistricting process in Carroll County, may

certainly be valid, that is a matter for the Legislature and not for this Court. Regardless of what the electorate, the Committee, the Delegation, or the parties may desire, the fact remains that neither the Circuit Court, nor this Court, has the power to, in fact, grant the relief sought.

Moreover, the plain language of P.L.L. § 3–101 and Article III, § 5 of the Constitution requiring action by the General Assembly to draw a redistricting plan simply cannot be severed. *See Park v. Bd. of Liquor License Comm'rs for Baltimore City,* 338 Md. 366, 384, 658 A.2d 687, 696 (1995); *Davidson v. Miller,* 276 Md. 54, 82–83, 344 A.2d 422, 439 (1975); *Maryland Unemployment Compensation Bd. v. Albrecht,* 183 Md. 87, 95–96, 36 A.2d 666, 670 (1944); *Mayor and Council of Hagerstown v. Dechert,* 32 Md. 369, 384 (1870). Contrary to the arguments of the parties, it is logical that in order to achieve the goal of a five commissioner election, there has to be a mechanism in place, one which we, as the Judiciary, cannot provide. This Court has held that:

> "[a] valid statute can only be passed in the manner prescribed by the Constitution, and when the provisions of that instrument, in regard to the manner of enacting laws, are wholly disregarded, in respect to a particular Act, it would seem to be a necessary conclusion that the Act, though having the forms of authenticity, must be declared to be a nullity."

*Harford County v. Bd. of Supervisors of Elections of Harford County,* 272 Md. 33, 38, 321 A.2d 151, 154 (1974), *quoting Anne Arundel County v. Moushabek,* 269 Md. 419, 422–23, 306 A.2d 517, 519 (1973); *Legg v. Annapolis,* 42 Md. 203, 221 (1875). We hold the Circuit Court's approval and authorization of the Consent Order was invalid.

The appellees fare no better under Maryland statutory law. The appellees claim that under CJP § 3–409, *supra,* the Circuit Court had the authority to review the matter below for declaratory judgment and to approve the Consent Order. The appellees claim further that, notwithstanding the final agreement reached between them in the trial court, that at the

outset of the matter there existed "an actual controversy." *See* CJP § 3–409(a). The appellants, while agreeing with the appellees that there did exist an initial controversy, proffer that that was simply not enough. Specifically, the appellants asseverate that the Consent Order signed by the parties rendered the issue moot, and that the Circuit Court was required to, but failed, to declare the rights and liabilities of the parties. We agree with the appellants.

While recognizing the remedial nature of the DJA and that it should be construed liberally, we have held that a justiciable controversy is a prerequisite to the maintenance of an action for declaratory relief. *See Secure Fin. Serv., Inc. v. Popular Leasing U.S.A., Inc.,* 391 Md. 274, 280–81, 892 A.2d 571, 575 (2006). *See also Boyds Civic Ass'n v. Montgomery County Council,* 309 Md. 683, 696–97, 526 A.2d 598, 605 (1987); *Hatt v. Anderson,* 297 Md. 42, 45, 464 A.2d 1076, 1078 (1983); *Harford v. Schultz,* 280 Md. 77, 85–86, 371 A.2d 428, 432 (1977). We have stated further that the declaratory judgment process is not available to those seeking a decision on purely theoretical questions that may never arise, or where a declaration would serve neither a useful purpose nor terminate the controversy. *Post v. Bregman,* 349 Md. 142, 159, 707 A.2d 806, 814 (1998); *Hickory Point P'ship v. Anne Arundel County,* 316 Md. 118, 129, 557 A.2d 626, 631 (1989); *Bishop v. Governor of Maryland,* 281 Md. 521, 524–25, 380 A.2d 220, 223 (1977); *Reyes v. Prince George's County,* 281 Md. 279, 289 n. 5, 380 A.2d 12, 18 n. 5 (1977); *see also Hamilton v. McAuliffe,* 277 Md. 336, 340, 353 A.2d 634, 637 (1976) ("[T]he declaratory judgment process is not available to decide purely theoretical questions or questions that may arise, ... or questions which may have become moot, ... or merely abstract questions...."). Once the parties below entered into the Consent Order, the underlying issue in the matter, in fact, became moot.

█ Moreover, as previously discussed at length in this opinion, the Circuit Court lacked jurisdiction to approve the Consent Order, and, thus, could not grant the appropriate

remedy. "Ordinarily the only place a [dismissal] has in the declaratory process is to challenge the legal availability of the remedy sought to be used." *Hunt v. Montgomery County,* 248 Md. 403, 408, 237 A.2d 35, 37 (1968). *See also Christ,* 335 Md. at 435, 644 A.2d at 37 ("It is proper to dismiss a declaratory judgment action only where there is a lack of jurisdiction or where a declaratory judgment is not an available or appropriate [ ] remedy"). This Court elucidated that, "[t]he test of the sufficiency of the [complaint for declaratory judgment] is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all[.]" *Shapiro v. Board of County Comm'rs,* 219 Md. 298, 302–03, 149 A.2d 396, 399 (1959). The Circuit Court, thus, erred in not dismissing the appellees' motion for declaratory judgment.

For the foregoing reasons, we held that three Carroll County commissioners were to be elected at-large, pursuant to P.L.L. § 3–101 as it provided immediately prior to the enactment of Chapter 417, 2003 Laws of Maryland.